MASON v. OLDS et al. (No. 8720.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 3, 1917. On Motion for Rehearing, Dec. 3, 1917.)

1. APPEAL AND ERROR ⬡499(4)—PRESERVATION OF EXCEPTIONS—INSTRUCTIONS.

In view of Vernon's Sayles' Ann. Civ. St. 1914, art. 2061, providing that the ruling on instructions shall be regarded as approved unless excepted to, and article 2062, providing that where the ruling of the court appears otherwise of record, no bill of exceptions shall be necessary, and article 1971, requiring the charge to be in writing and to be submitted to the parties for objections which shall be presented to the court before the charge is read, and that all objections not so made and presented shall be considered as waived, and in spite of article 1972, providing that the charge shall constitute a part of the record and shall be regarded as excepted to without the necessity of taking any bill of exceptions, where the record fails to disclose, either by bill of exceptions or filed objections to the charge, that any objections were made thereto, the court on appeal is justified in disregarding an assignment of error to the failure of the court to direct a verdict.

2. MORTGAGES ⬡38(1)—MORTGAGE IN FORM OF DEED—EVIDENCE.

Evidence *held* to show that it was the intention of all the parties to the instrument that the writing in form a deed absolute should constitute a mortgage or security for debt.

3. VENDOR AND PURCHASER ⬡244—NOTICE—DEED ABSOLUTE IN FORM—EVIDENCE.

Evidence *held* to show that plaintiff, a subsequent vendee, had notice before he purchased that a deed of the actual occupant and claimants was a mortgage, though in form absolute.

4. HOMESTEAD ⬡129(1)—MORTGAGE—NOTICE—OCCUPANCY.

As a rule, possession is notice of the possessor's title, and where a grantor by deed absolute in form, but in fact a mortgage, conveys a hometead, but is in fact in actual possession at the time of a subsequent conveyance by his grantee, or a subsequent grantee in chain of title, the purchaser under the subsequent conveyance has notice of the title under which the one in possession is holding.

5. EVIDENCE ⬡76—PRESUMPTIONS—FAILURE TO ANSWER.

The fact that plaintiff in suit in trespass to try title against the occupants of a homestead who had given a deed absolute in form intended to be a mortgage declined to state from whom he purchased the property, was a circumstance proper to be weighed by the jury in determining the weight of his testimony that he did not know, prior to his purchase, of the claims of the occupants.

On Motion for Rehearing.

6. HOMESTEAD ⬡129(1)—MORTGAGE—NOTICE—QUESTIONS FOR JURY.

The mere fact that a deed absolute in form, though intended by the parties as a mortgage, was of record at the time the plaintiff in trespass to try title purchased from a subsequent grantee under such deed, was not determinative of the sufficiency vel non of notice of the claim of mortgage given by reason of the defendant's occupancy as a homestead of the premises.

7. LIS PENDENS ⬡22(2)—NOTICE OF SUIT—EFFECT.

A lis pendens notice places the purchaser of the property on inquiry as to the real facts, and charges him with notice of what an investigation would have disclosed.

Error from District Court, Jones County; John B. Thomas, Judge.

Action by G. S. Mason against F. C. Olds and others. Judgment for defendants, and plaintiff brings error. Affirmed. On motion for rehearing. Motion overruled.

A. H. Kirby, of Abilene, for plaintiff in error. D. M. Oldham, Jr., of Abilene, for defendants in error.

BUCK, J. Plaintiff in error, hereinafter called plaintiff, filed suit in the form of trespass to try title against F. C. Olds and wife, Mrs. Frances B. Olds, and D. M. Oldham, Jr., for the recovery of a certain described lot in the city of Abilene, Taylor county, Tex. Defendants answered by general demurrer, general denial, and a plea of not guilty. The cause was submitted to a jury upon 10 special issues, the answers to which were favorable to defendants, and the court entered judgment in favor of Mrs. Olds and D. M. Oldham, Jr.; F. C. Olds having died subsequent to the filing of the suit and prior to judgment. From this judgment the plaintiff has prosecuted a writ of error.

The property in controversy was deeded by Mattie J. Irvine to Mrs. Frances B. Olds, for a recited consideration of $3,500 paid by Mrs.

Olds out of her separate estate, and was occupied and used as a homestead by Mr. and Mrs. Olds from the time of the purchase until Mr. Olds' death, and subsequently by Mrs. Olds and her son. In 1910, F. C. Olds, who was engaged in the cotton business at Abilene and in partnership with L. B. Blake, became indebted to the F. & M. National Bank of Abilene in a large amount, between $20,000 and $29,000, which indebtedness was unsecured. Negotiations between the bank and Mr. Olds, who was sick in bed at the time, resulted in the latter's agreeing to turn over to the bank all his property, consisting of an automobile, some bank stock, some compress stock, and his home. The testimony of Mr. Olds given on a former trial was used in this trial, and, according to his testimony and the testimony of Mrs. Olds, at the instance of the bank a deed to the home was made to L. B. Blake, the partner of Mr. Olds, but who was not involved in the indebtedness to the bank. The consideration recited was $4,000, evidenced by two vendor's lien notes of $2,000 each. The evidence of the defendants sustains the theory that the execution of this deed was not intended as an actual sale of the property to L. B. Blake, but was for the purpose of enabling the bank to use the notes as a security for the indebtedness owing it by Olds. The Olds were occupying the premises as a homestead at the time of the execution of the deed, and L. B. Blake was boarding with the Olds at said time.

Olds testified that in a conversation between him and the cashier of the bank, Mr. Henry James, at which L. B. Blake was present, he (Olds) agreed to turn over everything he had to secure the bank until the indebtedness could be repaid, and that during that year some $7,000 was in fact paid on the debt. The notes were made payable to Mrs. Olds and indorsed by her, and the bank seems to have required Olds to sign them also. Olds testified that the understanding between him and the bank, of which understanding Blake was cognizant, and to which he agreed, was that the notes were to be held until he (Olds) could "fix it up and then everything was to be turned back to me." He further testified that it was understood and agreed that the deed was not to be put of record, and no steps taken by the bank or by Blake which would cast a record cloud on the title to the property. Later, these notes were purchased from the bank by Henry James, the cashier, and by him sold to J. B. Adoue, Sr., of Dallas, and a deed from L. B. Blake and wife to J. B. Adoue, of date July 10, 1912, was executed, conveying the property in controversy, the consideration recited being the cancellation of the two $2,000 notes theretofore executed by Blake to Mrs. Olds. Subsequently, the property was conveyed by Adoue to G. S. Mason, plaintiff below.

198 S.W.—66

Plaintiff in error's first assignment complains of the failure of the court to direct a verdict for him, on the theory that he showed the title to the property to be in him, through the introduction of the deed from Mrs. Irvine to Mrs. Olds, the deed from Mrs. Olds to Blake, the two notes described in the last-named deed and the cancellation thereof, the deed from Blake and wife to Adoue, and the deed from Adoue to Mason, and that the defendants below failed to show by any competent evidence that plaintiff had not the title evidenced by these several instruments of conveyance. Defendants in error object to the consideration of this assignment, and of the other assignments contained in plaintiff in error's brief, because, as asserted, the case is not prepared for submission and hearing under the rules; that the cause was submitted to a jury and involves a great mass of facts based on oral and written testimony; that the plaintiff below did not make any objection or take any exceptions to the matters submitted to the jury by the court in its general charge, nor were any objections made or exceptions taken to the refusal of the court to give his requested special instructions, either before or after the argument was made to the jury; that the first time any exceptions or objections were made was after the verdict of the jury and contained in the motion for new trial. We find the state of the record to be as claimed by defendants in error. There is not a bill of exceptions in the record. Article 2061, V. S. Texas Civil Statutes, provides:

"The ruling of the court in the giving, refusing, or qualifying of instructions to the jury shall be regarded as approved, unless excepted to as provided for in the foregoing articles."

Article 2062, Id., provides:

"Where the ruling or other action of the court appears otherwise of record, no bill of exceptions shall be necessary to reserve an exception thereto."

Article 1971, Id., is in part as follows:

"The charge shall be in writing and signed by the judge; after the evidence has been concluded the charge shall be submitted to the respective parties or their attorneys for inspection and a reasonable time given them in which to examine it and present objections thereto, which objections shall in every instance be presented to the court before the charge is read to the jury, and all objections not so made and presented shall be considered as waived. * * *"

Article 1972 reads as follows:

"Such charge shall be filed by the clerk and shall constitute a part of the record of the cause [and shall be regarded as excepted to, and subject to revision for errors therein, without the necessity of taking any bill of exception thereto.]"

As to whether that part of article 1972 beginning with "and shall be regarded," etc., and ending with "thereto," has been superseded by article 2061 heretofore set out has been the occasion of some contrariety of opinion by the courts, but the Supreme Court, in G., T. & W. Ry. Co. v. Dickey (Sup.) 187 S.

W. 187, has held that article 1972 was not repealed by implication by the Acts of the 33d Legislature, chapter 59, amending Revised Statutes 1911, art. 1974, 2061. But this authority does hold that in order to obtain a review of the general charge of the court on appeal because of an alleged error therein, an objection to the charge in the particular complained of must be presented to the trial judge before the charge is read to the jury.

Article 1974 provides:

"When the instructions asked, or some of them, are refused, the judge shall note distinctly which of them he has given and which he refused, and shall subscribe his name thereto, and such instruction shall be filed with the clerk and shall constitute a part of the record of the cause subject to revision for error."

This article was amended in chapter 177, p. 389, Acts of the 35th Legislature 1917, which amendment specifically provides that the action of the trial judge in refusing a special instruction should be reviewed on appeal in the absence of a formal bill of exceptions. But since this amendment was not in force at the time of the trial, perhaps we would not be justified in determining the issue here presented in the light of such amendment. In the Dickey Case, the Supreme Court says:

"The effect, therefore, of amended article 2061 is to require the taking of a written bill of exception to the giving or refusing of a special instruction in order to have a revision of the court's action on the appeal."

In Pierce v. Supreme Lodge, etc., 190 S. W. 1156, the San Antonio Court of Civil Appeals holds that article 1971 requiring objections to a charge to be presented before it is read to the jury, etc., and where the record fails to show that a peremptory instruction given was objected to, the appellate court will not review the correctness of the ruling on the theory that they are considering a matter of fundamental error.

[1-3] From what we have said above and the authorities cited, we are of the opinion that since the record fails to disclose, either by bill of exceptions or filed objections to the charge, that any objections were made to the giving of the general charge, or to any part of the same, that we would be entirely justified in overruling plaintiff in error's first assignment. But if we are mistaken as to our duty in this respect, we are of the opinion that the assignment should be overruled on its merits. While this suit was in form of trespass to try title, yet the real issue was whether the deed made by Mrs. Olds and her husband to L. B. Blake was an absolute conveyance of the property, or was intended as a mortgage or a security for the debt of F. C. Olds to the F. & M. National Bank, and whether plaintiff below had notice of the same at the time of the execution of the deed from Adoue to him and its acceptance by him. The deed from Adoue to Mason was dated August 5, 1912, and acknowledged August 7, 1912, and recorded on the 24th thereafter in the deed records of Taylor county. On July 17, 1912, there was filed a lis pendens notice with the county clerk of Taylor county of a certain suit by Mrs. Frances B. Olds and husband against J. B. Adoue, Jr., and others, to remove a cloud from title to the property in question and to cancel the deed from Mrs. Olds and husband to Blake, and the two vendor's lien notes heretofore mentioned. While the deed from Blake was made to J. B. Adoue, Sr. (though he was not designated as "Sr." in the deed), the father of J. B. Adoue, Jr., yet it appears that the son was attending to this transaction for his father, and apparently it was the understanding and belief of the plaintiffs in this first suit that the deed had been in fact made by Blake to the son instead of to the father. As a result of this suit, on September 4, 1912, Mrs. Olds recovered title and possession to the property involved as against L. B. Blake, Henry James, and J. B. Adoue, Jr. This judgment recited:

"It is therefore the order, judgment, and decree of the court that plaintiff Mrs. Frances B. Olds do have and recover of and from the defendants, L. B. Blake, Henry James, and J. B. Adoue, Jr., the title and possession of the following described property, * * * and it is further the order, judgment, and decree of the court that the above-mentioned deed from Frances B. Olds and husband, F. C. Olds, to the defendant L. B. Blake is a pretended sale of plaintiff's homestead involving a condition of defeasance, and is void and of no effect. And it is the order, judgment, and decree of the court that the two vendor's lien notes of date September 16, 1910, and due four and eight months after date, respectively, and for the sum of $2,000 each, with interest from date, executed by defendant L. B. Blake and payable to plaintiff, Mrs. F. B. Olds, or order, and more fully described in said deed from plaintiff to defendant L. B. Blake, are null, void, and of no effect. And the title to said premises is hereby adjudged and decreed free from all rights, titles, or claims existing not heretofore claimed by the defendants L. B. Blake, J. B. Adoue, Jr., or Henry James."

It will be noted that in the deed from Blake, so far as the record discloses, the grantee's name is given merely as "J. B. Adoue," and the indorsement on the two notes heretofore mentioned is, "Canceled by deed of L. B. Blake and wife to J. B. Adoue for property herein described."

It is further in evidence that plaintiff in error purchased the property while the litigation under the last-mentioned suit was pending and while the defendants in error were actually residing upon and using the premises involved as their homestead. The evidence discloses that subsequent to the execution of the deed from Mrs. Olds and husband to Blake, the Olds occupied the premises, paid the insurance and taxes, kept up the repairs, etc. In addition to the testimony of Mr. Olds, the purport of which upon this point has heretofore been given, Mrs. Olds testified, in brief, when the notary came to take her acknowledgment that she asked Mr. Blake was he going to take

her home away from her and he said, no; that he had no money to pay for the house and was only buying it to evade the homestead law; that she asked him when she could get it back and he said just as soon as they could pay off the debt; that she executed the instrument merely as a mortgage and did not intend it as a sale. Blake testified, in substance, that he executed the two $2,000 notes and turned the notes and deed over to Mr. Olds and Mr. Olds carried them to the bank, but he never did have possession of the deed from the Olds to himself and never saw the acknowledgment until he signed the deed to Adoue and mailed it to the latter at Dallas on July 12, 1912. That he wrote to Olds a year and a half later to take care of the notes and pay them; that he (Blake) had gotten mixed up in the matter and wanted to get out of it the best he could; that he took the deed to himself to protect Olds, because it was thought that he was a disinterested party and would do the right thing by both sides; that he agreed to hold the deed off the record; that it was understood by Mr. James, Mr. Olds, and himself that he (Blake) was to act as the agent and attorney for James, or the bank. J. B. Adoue, Jr., testified that he resided in Dallas and was engaged in the banking business; that the notes were purchased by his father; that Mr. James came to his father and spoke to him and told him he had those notes, and that he, the son, was sitting about 10 feet away, and that his father told him to take the notes from Mr. James, and that he attended to the rest of the transaction; that this occurred in the spring from March to May, 1912. J. B. Adoue, Sr., testified that he did not know that he had ever owned the two vendor's lien notes given by Blake, nor that he had ever had any business transactions or connections with Blake, or the Olds; that if he had owned them, the transaction was handled by his son, J. B. Adoue, Jr.; that he had no knowledge of the deed from Blake and wife conveying the property to him. The deed was never turned over to him and that he had no recollection of ever having seen it; that he had no recollection of ever selling the property to G. S. Mason; that if it was sold to him, the transaction was handled by his son.

Plaintiff testified by deposition:

"I had no dealings whatever with J. B. Adoue, Jr., or J. B. Adoue, Sr., of Dallas, before I received a deed to this place. I was in San Angelo when I received a deed to this property. I never did go to the county clerk's office of Taylor county and examine the deed records to see what was there recorded concerning this property. I did not go and look at the property before I purchased it because I was living at San Angelo, some distance from Abilene and purchased the property at the request of a personal friend in whom I have explicit confidence. I had a conversation with Mr. Ed S. Hughes before I purchased this property. He did not tell me that the title was good. I feel quite positive that he did not say to me that I would not lose any money on this property. No one told me that the title to the property was good, that I can remember of, but I relied upon the abstract with opinion of D. M. Oldham, Jr., attached, stating that title was good and the chain of title through the deeds handed me by the bank from Irvine down to and including J. B. Adoue. I relied upon these facts in forming my conclusions that the title was good. * * * I decline to say who first told me this property could be bought. * * * I never did attempt to rent this property to any one. I considered it useless to try to rent it, as the occupant refuses to give up possession. I have had no one directly looking after the property for me since I purchased it. I did not know before I bought this property that F. C. Olds and his wife were living on same and claiming it as a homestead. * * * I decline to state with whom I made a trade for this place and at what time and place the trade was made."

We think enough evidence has been cited to support the findings of the jury to the effect: (1) That it was the intention of all parties to the transaction, to wit, F. C. Olds and wife, L. B. Blake, and the F. & M. National Bank, that the purported deed from Olds and wife to L. B. Blake should constitute a mortgage or security for debt and not an absolute conveyance, and (2) that Henry James at the time of the purchase by him from the bank of the two notes in question had notice that the transaction theretofore made between the Olds on the one hand and Blake and the bank on the other, was intended as a mortgage, and (3) that J. B. Adoue, or his son and agent, J. B. Adoue, Jr., at the time of the purchase of the note by J. B. Adoue from Henry James, had such notice, and (4) that the plaintiff had such notice before he received the deed to the lot in controversy.

[4] As a rule possession is notice of the possessor's title, and where a grantor by deed, absolute in form, but in fact a mortgage, conveys a homestead, but is in fact in actual possession at the time of a subsequent conveyance by his grantee, or a subsequent grantee in chain of title, the purchaser under the subsequent conveyance has notice of the title under which the one in possession is holding. Henderson v. Wilkinson, 159 S. W. 1045; Trammell v. Chamberlain, 61 Tex. Civ. App. 650, 131 S. W. 227, on second appeal affirmed in 195 S. W. 1135, by Supreme Court; Collum v. Sanger Bros., 98 Tex. 162, 82 S. W. 459, 83 S. W. 184. There seems to be no question but that the requirements of the lis pendens notice provided in article 6837 et seq. V. S. Texas Civil Statutes, was complied with by the plaintiffs in that suit, defendants in this suit, and that such notice was filed prior to the execution of the deed from J. B. Adoue to plaintiff below, such notice being filed July 17, 1912, and the deed to Mason being executed August 7th thereafter. Hence we overrule plaintiff in error's first assignment. Paris Gro. Co. v. Burks, 99 S. W. 1135; Latta v. Wiley, 92 S. W. 433; Burke-Simmons Co. v. Konz, 178 S. W. 587.

Under his second assignment plaintiff in error attacks the finding of the jury to the

effect that the F. & M. National Bank and Henry James, cashier, and Rich Keeble of the bank had notice that F. C. Olds and wife at the time they executed the deed to the lot in controversy to Blake, and at the time the latter executed the notes in controversy, intended said transactions as a mortgage or security for a debt. In addition to the testimony heretofore set out bearing on this point, Mrs. Olds testified as follows:

"That indebtedness accrued in the fall of 1910, about the last of August, and we found out about it the middle of September. It was a cotton transaction and we thought we were going to get our money back for the cotton, and we found out we didn't get any money, but instead we were indebted to the bank, and I was told this loss had occurred, and Mr. Olds and Mr. Blake were both there at the house. * * * I don't know that Mr. James came to our house to see about the loss. We were good friends then and he visited our house and he came to see us and Mr. Olds was sick and he couldn't see Mr. Olds. Dr. Alexander was there and told him Mr. Olds was unable to transact business. At that time he was not permitted to see Mr. Olds, and I told him why. Later on I was asked to transfer my house, and I asked Mr. Blake and Mr. Olds how we were going to do it. I told them we couldn't do it in Texas, because it was our home, and they told me to evade the homestead law they were going to have Mr. Blake take it in his name and he would give some notes—through Mr. Blake we were going to evade the homestead law and put up the notes to secure Mr. James against the bank examiner. That took several days to decide what we were going to do, but finally Mr. Reed came to our house just after the noon hour—I know that Mr. Reed was a notary in Mr. Kirby's office. * * * I asked Mr. Reed what he was going to do and he said he was going to transfer the homestead to Mr. Blake. * * * I had conversations with Henry James about the loss. He just said he would get things fixed up and help Fred out. I never talked to him in regard to what kind of papers we were going to execute. He told me he would see that we got things fixed up all right. I never had any conversations with Mr. Keeble. Neither Mr. James or Mr. Keeble were ever present during the conversations I had with Mr. Blake and Mr. Olds. * * * I only know that Mr. James told me one night when we were out at the gate, with his elbows on the gatepost, he would see us through all right, but we had no conversation about the homestead. * * * When he said we would fix it up he was talking about the repayment of the debt to the bank. I was just telling him I would give part of what I had. I had $600 in the bank and I gave that up. * * * I told him I would do everything in my power to help out. I wanted Mr. Olds to continue in business and I told him it would secure him in such a way as to protect him against the bank examiner so he could show some security. I think Mr. James' faith was good at the time. We gave up our auto, that was sold, and Mr. Olds got $1,750 for it, * * * and turned it over to the bank."

Mr. Olds testified:

"At that time" (the time of the conversation between him and Mr. James, at which Blake was present) "there was nothing said about deeding the place to anybody, except that we were going to turn the place over and they were going to fix it up; how they were going to fix it up, I don't know. It is not a fact that I offered to absolutely deed that place to them in part settlement of my debt. No sir, only as to hold as collateral against what I owed them. If I had, I certainly would not deed them a place for $4,000 which was worth $5,000. * * * There was not a single, solitary word said up there about me deeding the property to Mr. Blake. His name was brought into it later because they said they didn't want it to go in their names; they better put it in some outsider's name to hold. * * * I took those notes in person and delivered them to either Mr. James or Mr. Keeble shortly after they were dated, and nothing was said except that they would be held and would be turned back to me whenever I paid up. I just gave them the deeds and there was nothing said about it. * * * I did not have any conversation with Mr. James relative to the holding of these notes and deeds after the meeting when he said he would have them fixed up; when he said they would hold the deed and nothing would go on record and there would be no transfer made and when the indebtedness was paid they would all be turned back to me. * * * He said they would have to fix it some way to get around the homestead law. That is the reason he used Mr. Blake's name. * * * It was told me in the presence of Mr. Keeble and Mr. James, I think it was Mr. James, that they would have to fix it that way, on account of the homestead law."

We think enough evidence has been quoted to justify the jury in finding that the bank, through James and Keeble, knew of the understanding on the part of Mr. and Mrs. Olds that the deed and notes were intended to be used as security, and the transaction did not partake of the nature of an absolute conveyance. If all parties understood that it was to be an absolute conveyance, there would have been no reason for Mr. James' thinking that it was necessary to have the property deeded to Mr. Blake, in order to get around the homestead law; for if the grantors had intended the conveyance to be absolute, the deed might have been made direct to the bank, or to one of its officers for the bank. Therefore we overrule the second assignment, and also the third, which latter assignment attacks the finding of the jury to the effect that Mr. Blake, the F. & M. National Bank and its officers and agents intended that the instrument under consideration should be considered as a mortgage.

[5] The fourth assignment attacks the finding of the jury to the effect that plaintiff below had notice of the claimed mortgage nature of the instrument from the Olds to Blake mentioned. We think that constructive notice, at least, was shown by the lis pendens record introduced. Moreover, the fact that the plaintiff below declined to answer the question as to through whom he purchased the property in controversy, was a circumstance proper to be weighed by the jury in determining the weight of his testimony, to the effect that he did not know, prior to his purchase, of the claim now asserted by defendant Mrs. Olds and her husband. The well-known case of Eylar v. Eylar, 60 Tex. 315, is cited by plaintiff in error to sustain the proposition that a purchaser from a vendee, whose vendor remains in possession, is not required to inquire further if vendee's property is properly registered. In the cited case, the Supreme Court held

that a purchaser from a vendee whose deed was duly recorded, the vendor remaining in possession, would not be bound to inquire into a secret trust or right by which the vendor remained in possession, and this announcement of the law has been followed by our courts in a long line of decisions, and we are not called upon to decide whether Moore v. Chamberlain (Sup.) 195 S. W. 1135, overrules this line of decisions. Yet we do not understand that the Eylar Case holds, or that any other Supreme Court decision to which we have been referred holds, that a purchaser can shut his eyes to the actual knowledge of an adverse claim, which claim is apparently contrary to the recitations of a deed executed by a claimant. Nor that notice may not be brought to the purchaser of the adverse claim by putting of record under the lis pendens law the nature and character of the claim of title asserted by the vendor in the instrument theretofore recorded. Moreover, the Eylar Case is inapplicable here because the purported deed from the Olds does not appear to have been of record at the time of the conveyance from Adoue to Mason. Hence we overrule the fourth assignment and affirm the judgment.

Affirmed.

CONNER, C. J., not sitting, serving on writ of error committee at Austin.

### On Motion for Rehearing.

BUCK, J. Plaintiff in error calls our attention to an evident error in our original opinion in the use of the following language, to wit:

"Moreover, the Eylar Case is inapplicable here, because the purported deed from the Olds does not appear to have been of record at the time of the conveyance from Adoue to Mason."

Counsel calls our attention to page 17 of the statement of facts, where it is shown that the deed from the Olds to Blake was "filed for record May 20, 1911," in the office of the county clerk of Taylor county. We were no doubt led into this misstatement by the unchallenged assertion in defendants in error's brief to the effect that plaintiff in error "was claiming under an unrecorded deed," and by the further fact that the statement of facts, page 2, where it records the introduction of this deed by plaintiff in error merely recites that "said deed recorded in volume 42, page 573, Taylor county deed records," and fails to give the date of said record. Therefore we concluded that the record failed to show the date of the filing and recording of said deed, and assumed that the statement made in defendant in error's brief referred to this deed and was a statement of an uncontroverted fact. But it appears that the omission to show date of filing and recording of said deed at the time the same was introduced in evidence by plaintiff in error was supplied at the time of the introduction of the deed by defendant in error. The deed from J. B. Adoue to plaintiff was acknowledged August 7, 1912, and recorded August 24, 1912. Hence it follows that the deed from the Olds to Blake was of record at the time plaintiff in error purchased the property, and we desire to withdraw the statement to the contrary.

[6] But we do not think the fact that the deed from the Olds to Blake was of record at the time Mason purchased the property would be determinative of the question of the sufficiency vel non of notice given, by reason of the Olds being in possession of and occupying as a homestead the premises involved. As is shown in the first appeal of Chamberlain v. Trammell, 61 Tex. Civ. App. 650, 131 S. W. 227, cited in the original opinion, the purported deed from the Chamberlains to Carson, and the deed from Carson to Trammell, were of record at the time the guardian of Worth Moore purchased the vendor's lien notes mentioned in the deed from the Chamberlains. While the opinion of the Court of Civil Appeals in 61 Tex. Civ. App. 650, 131 S. W. 227, on the first appeal expressed the conclusion that the decision rendered by said court was not necessarily in conflict with the holding in the Eylar Case, because in the Chamberlain Case the premises were in possession of tenants of the Chamberlains, yet it seems to us that such possession by a tenant fails to present any real difference, for the very basis of the decision in the Chamberlain Case was the holding that the possession by tenant under the circumstances did not constitute an abandonment by the Chamberlains of the property as a homestead; that the possession of the tenant was in fact the possession of the real owners. On the second appeal, this court followed the decision of the Texarkana court, as being the law of the case until overruled by the Supreme Court, without attempting to say whether it would have held differently if the question had been an original one with it. See 152 S. W. 195. The Supreme Court affirmed the judgment in an opinion found in 195 S. W. 1135, without attempting to differentiate the facts from those disclosed in the Eylar Case, using the following language:

"We are of the opinion that the deed of conveyance by the trustee, Locket, to the plaintiff in error, Moore, was void, and not voidable. When the plaintiff in error purchased the land from the trustee, it was in possession of the tenants of the Chamberlains. This placed him upon inquiry, as a matter of law, as to whether the deed from the Chamberlains to Carson and from Carson to Trammell were absolute, or were intended only as mortgages. There being no finding that he exercised any diligence by making inquiry, the possession of the tenants constituted actual notice to him that the deeds were intended as mortgages. Ramirez v. Smith, 94 Tex. 191, 59 S. W. 258; Collum v. Sanger Bros., 98 Tex. 162, 82 S. W. 459, 83 S. W. 184. Under the provisions of the Constitution a mortgage, as between the parties to it and as to others not innocent purchasers, upon a home-

stead is void, and not voidable. Const. art. 16, § 50."

In the instant case, there was not merely the absence of a finding by the jury that plaintiff in error was an innocent purchaser, but there was a positive finding that he had notice that the purported deed from the Olds to Blake was intended as a mortgage, and also that his predecessors in title subsequent to the Olds had such notice. There is some language used in the Ramirez v. Smith Case, supra, indicating an opinion that the holding in the Eylar v. Eylar line of cases must be based on a showing that the purchaser examined the record and found thereon a deed in form and purport from the claimant, before he can effectually meet the defense of notice urged by the claimant by reason of the latter's occupancy of the premises as a homestead at the time of the purchase. In other words, in order for his adversary to overcome the burden of notice of claimant's right and title by reason of the latter's possession, such adversary must show that he examined the record and was misled thereby, and that the claimant is thereby estopped from showing the truth. If this be the reasoning indicated in the last-cited case. and it seems to us that the holding in the Eylar Case is evidently predicated on the theory of estoppel, then in the instant case the plaintiff in error fails to show facts entitling him to rely on such a plea. The testimony of plaintiff in error discloses that he made no examination of the deed records, never saw the property, and knew neither of the Adoues, nor Blake, nor the Olds, and relied "on an abstract to this property with opinion signed D. M. Oldham, Jr., dated November 5, 1909." This, was prior to the execution of the mortgage by the Olds. Plaintiff in error further testified:

"Mr. James never discussed this property with me at any time. I purchased this property at the request of a close personal friend, but I decline to give his name. I decline to give the name of the party who first offered this property to me for sale. I bought this property because I was requested to do so by a personal friend. I decline to state on whose representations I relied in making this purchase. These representations were made to me in San Angelo, but I decline to tell where the other party was. If I ever saw this property I do not know it. * * * The fact is the abstract of title, with D. M. Oldham, Jr.'s, opinion, dated November 5, 1909, stating that the title was good in Mrs. Mattie J. Irvine, was turned over to me upon the payment of the $3,500 draft to the San Angelo National Bank. At the same time the bank turned over to me with the abstract and Mr. Oldham's opinion attached, stating title was good, deed from Mattie J. Irvine to Francis B. Olds, and also deed from Francis B. Olds to L. B. Blake, and deed from L. B. Blake to J. B. Adoue, and deed from J. B. Adoue to G. S. Mason. All these papers were turned over to me at the time of my settlement with the bank, and I have had them in my possession ever since. * * * No one told me that the title to the property was good, that I can remember of, but I relied upon the abstract with opinion of D. M. Oldham, Jr., attached, stating that title was good, and the chain of title through the deeds handed me by the

bank from Irvine down to and including J. B. Adoue. I relied upon these facts in forming my conclusion that the title was good. I don't understand that I bought this property from the Mason-Hughes Company, a concern incorporated and doing business at Abilene and San Angelo, Tex. The officials of this Mason-Hughes Company are G. S. Mason, president, and Ed S. Hughes, secretary and treasurer. I do not know that the property in controversy was ever listed with the Mason-Hughes Company for sale."

An excerpt from Mr. Olds' testimony may tend to shed light upon the source of Mason's information concerning the property in controversy. Mr. Olds testified:

"At the time I testified that I owed them something over $20,000, they didn't hold my notes at that time. After that Mr. Keeble asked me to come over and see Mr. James and fix it up. I was sick at that time in bed. That was about the 1st of September, 1910. When I got up Mr. James was out of town a few days, and when he came back, Mr. Keeble met me on the street and said Mr. James was in town and wanted me and Blake to go to the bank, which we did, and went up to Mr. Hughes' office. Mr. Keeble, Blake, Henry James, and myself went up to Mr. Hughes' office. When we got up there Mr. James asked how bad it was and I told him, etc."

Apparently, from this testimony, Mr. Hughes had some connection with the bank, whose officers sought to secure an indebtedness owing to it from Olds, by the means disclosed in the record. It is probably justifiable for us to conclude that the relationship of Mr. Hughes to the bank and to the Mason-Hughes Company was made more apparent to the Taylor county jury, who were likely acquainted with Mr. Hughes and his business connections, than would be shown by the mere recitation of the portion of the testimony hereinabove set out. It is often true that during the trial of a case important evidentiary facts rest upon seemingly slight testimony, because special significance is given to such testimony by reason of conditions and circumstances generally known and recognized by counsel and jurors. While we are not disposed to read into the record something there not contained, yet we are not prepared to say that the jury was unauthorized to find from the evidence just quoted that Mr. Hughes was an officer in the Abilene bank as well as in the San Angelo company, and that the jury was not justified in concluding that when the plaintiff in error testified that he had a conversation with Hughes before he purchased the property, and when he stated that the representations were made to him in San Angelo, but declined to state where the other party to the conversation was, that the witness thereby practically admitted that the telephone conversation referred to was with Mr. Hughes himself. It is often difficult to present in the dry recitations in a statement of facts the importance and force of a palpable evasion by an interested witness of a question propounded, or the significance to be given of his refusal to answer, etc. The jury who heard the testimony and listened

to and saw the witnesses testify reached the conclusion that plaintiff in error knew at the time he purchased the property that the deed from the Olds was intended as a mortgage; the court, who also heard the testimony, declined to set aside that verdict, but on the contrary entered judgment thereon, and we do not feel justified in disturbing that verdict and judgment by holding that the evidence is insufficient to sustain the finding of the jury that the plaintiff in the case did have such knowledge.

[7] By the use of the expression in the original opinion, to wit, "We think that constructive notice, at least, was shown by the lis· pendens record introduced," we did not mean to hold that the lis pendens notice provided in the statute constituted constructive notice itself, but only that it placed the purchaser of the property on inquiry as to what the real facts were; as to what an investigation would have disclosed. If he had followed the direction of this signpost, the plaintiff in error would have found that suit had been filed by Mrs. Olds on July 12, 1912, in the district court of Taylor county to remove cloud from title and to cancel the very instrument, and the notes thereunder, the validity of which plaintiff in error seeks to rely on in this case. If he had pursued his investigation further, he would have found that a judgment had been entered in favor of Mrs. Olds and her husband, on September 4, 1912, canceling said deed and notes.

We are of the opinion that the motion for rehearing should be overruled and it is accordingly so ordered.

CONNER, C. J., not sitting, serving on writ of error committee at Austin.