In the Matter of Bobby R. **RUBARTS** and Naomi Rubarts, Debtors.

Bobby R. **RUBARTS** and Naomi Rubarts, Appellants,

v.

**FIRST GIBRALTAR BANK, FSB, Appellee.**

No. 89–2364.

United States Court of Appeals, Fifth Circuit.

March 12, 1990.

Elizabeth A. Bates, Mankoff, Hill, Held & Goldburg, Dallas, Tex., for appellants.

Walter H. Dunlap, Jr., Jordan Dunlap & Prather, Edmund R. Wood, Stephen F. Shaw, Stewart Title, Chancellor & Wood, G. Dennis Sullivan, Dallas, Tex., for First Texas Sav. Ass'n.

Before GEE, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Plaintiffs appeal from a judgment declaring a vendor's lien and deed of trust lien on their residence enforceable. Because we disagree with the district court's conclusion that the evidence in the record is sufficient to strip from the plaintiffs the homestead protections afforded by the Texas Constitution, we reverse and remand.

## I.

In 1968, plaintiffs Bobby and Naomi Rubarts obtained a construction loan from Sherman Savings and Loan Association ("Sherman Savings") for the principal sum of $34,700 to build a home at 915 Western Hills, Sherman, Texas. The "Western Hills residence." After the house was completed, the Rubartses executed a first mortgage note and lien in favor of Sherman Savings. Sherman Savings later became First Texas Savings Association ("First Texas").[1]

In 1979, Bobby Rubarts, acting in his capacity as president of the Rubartses' wholly-owned corporation, Diversified Industries, Inc. ("Diversified"), approached First Texas about securing a loan for the development of other property they owned, known as the "Louella property." Diversified badly needed funds to develop the Louella property, but the Rubartses found that First Texas would not accept any of the company's assets as collateral, since those assets already were too heavily en-

---

**1.** First Gibraltar Bank, FSB, is the successor in interest to First Texas as to this matter and has been substituted as appellee.

cumbered. The Rubartses then arranged to have Diversified purchase the Western Hills residence in order for Diversified to secure the desired loan from First Texas.

Although the property was transferred to Diversified, the Rubartses continued to use it as their primary residence and maintained the insurance policy on the house. Prior to the conveyance, a vice-president of First Texas, Carney Wilson, inspected and appraised the property, aware that it was the Rubartses' home. After Diversified received the loan proceeds, it paid off the prior first lien on the property, which First Texas itself held, and used most of the remainder of the loan proceeds to pay off some of Diversified's short-term indebtedness.

Sometime after March 1979, the Rubartses indicated to First Texas that they wished to reconvey their residence for tax purposes, as they needed the federal income tax interest deduction from their *personal* income tax. First Texas explained that in order to do so, they would need to negotiate a new loan. However, noticing that the deed of trust and conveyance did not preclude a reconveyance, the Rubartses did so anyway; in June 1980, Diversified, acting through the Rubartses as officers, reconveyed the property to them individually.

The Rubartses continued to live in the residence until 1985. The 1979 note has been in default since September 1, 1985. In September 1984 Bobby Rubarts had declared personal bankruptcy and had claimed the home as exempt under Texas's homestead provisions.

The Rubartses brought this action to declare First Texas's deed of trust lien on their residence unenforceable.[2] In a memorandum opinion, the district court held that the First Texas lien on the property was valid, despite the Rubartses' secret designs to reconvey.

2. The Rubarts initially filed their adversary proceeding in bankruptcy court. The reference was withdrawn to federal district court, which has jurisdiction, sitting as a trial court, to hear adversary proceedings pursuant to 28 U.S.C. §§ 1334(a) and 157(d).

3. Tex. Const. art. XVI, § 50, provides,

## II.

We first consider the posture of this case in terms of the Bankruptcy Code. In addition to holding that Texas law does not bar a judgment for debt and foreclosure by First Texas against the Rubartses, the district court held that the debt is non-dischargeable within the meaning of section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A). However, at oral argument First Texas acknowledged that the determination of dischargeability was premature, and we agree, thanking First Texas for its candor.

In an action under chapter 13 of the Bankruptcy Code, a debtor cannot receive a discharge until either (i) the chapter 13 plan is successfully completed or (ii) the debtor has applied for a hardship discharge under 11 U.S.C. § 1328(b). Under both the express wording of section 1328(a) and Bankr.R. 4007(d), an objection to dischargeability cannot be filed nor heard prior to the occurrence of one of those two events. *See In re Heincy,* 858 F.2d 548, 550 (9th Cir.1988). We note, as well, that under section 1328(b) a debtor cannot seek a hardship discharge until after confirmation.

Thus, the issue of dischargeability is not ripe, irrespective of our determination regarding the validity of the homestead claim. Nonetheless, the homestead issue is properly before us, as the parties actively litigated the validity of the lien in terms not only of dischargeability but also in terms of the claim and cross-claim regarding the lien's validity and First Texas's right to foreclose.

## III.

The Rubartses contend that the deed of trust lien created in favor of First Texas was invalid in that it violated the homestead provisions of the Texas Constitution.[3]

The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon, and in

They argue that although they conveyed their home to Diversified, First Texas acknowledged that the transaction was merely a pretense to circumvent the Texas homestead laws. Indeed, the Rubartses assert that they never had any intention of relinquishing their homestead rights.

As the challenger to the Rubartses' homestead status, First Texas has the burden of demonstrating that their homestead rights have been terminated. *McFarland v. Rousseau*, 667 S.W.2d 929, 931 (Tex.App.—Corpus Christi 1984, no writ).[4] Once it is established that the property is a homestead, there is a presumption that the homestead status continues unless terminated. *Sullivan v. Barnett*, 471 S.W.2d 39, 43 (Tex.1971). Under Texas law, one method by which the homestead right may be terminated is by abandonment. *Hollifield v. Hilton*, 515 S.W.2d 717 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.). However, there is no evidence in this record that the Rubartses' homestead rights were ever terminated by abandonment; they lived at the residence continuously until 1985.

## IV.

■ First Texas, however, relies upon an estoppel theory, contending that the Rubartses' absolute conveyance of the property estops them from asserting their homestead rights. However, in a recent case in which we undertook a thorough review of Texas homestead law, we observed that a homestead claimant is not estopped to assert his homestead rights, even if declarations have been made to the contrary, as long as the claimant is in actual possession of the homestead. *See In re Niland*, 825 F.2d 801 (5th Cir.1987).

> [N]o estoppel can arise in favor of a lender who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing contrary to the fact. To hold otherwise would practically abrogate the Constitution.

*Id.* at 808 (quoting *Texas Land & Loan Co. v. Blalock*, 76 Tex. 85, 89, 13 S.W. 12, 13 (1890)). *Niland* involved a debtor's misrepresentations as to which of his properties was his homestead. The question we address in the instant appeal, however, is whether the Rubartses' *execution* and recordation of a warranty deed conveying their residence in fee simple to Diversified is sufficient to estop their homestead claim.

The answer to this question is found in Texas authority dating well into the nineteenth century. First Texas would have us hold that a lienholder need only rely upon the recorded warranty deed as evidence of the grantor's intent to effect an absolute conveyance and that the Rubartses are estopped from making their homestead claim. First Texas, as did the district court, relies heavily upon the venerable case of *Eylar v. Eylar*, 60 Tex. 315 (1883), and its progeny.[5]

In *Eylar*, the court considered the homestead claim of J.F. Eylar and his wife, who conveyed their saddle shop and residence by general warranty deed to O.A. Eylar in return for consideration recited as $500.

this last case only when the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead; nor may the owner or claimant of the property claimed as homestead, if married, sell or abandon the homestead without the consent of the other spouse, given in such manner as may be prescribed by law. No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasance shall be void.

4. A recent bankruptcy decision opines that the burden is on the homestead claimant. *See Girard v. Unilife Ins. Co.*, 104 B.R. 817, 820 (Bankr.W.D.Tex.1989). As *McFarland* suggests, this is in error; the only authority cited for the proposition, *Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.), says nothing about the burden of proof.

5. *See e.g., Ramirez v. Smith*, 94 Tex. 184, 59 S.W. 258 (1900); *Love v. Breedlove*, 75 Tex. 649, 13 S.W. 222 (1890); *Hurt v. Cooper*, 63 Tex. 362 (1885).

In fact, however, the consideration paid by O.A. Eylar was not $500, but instead took the form of the repayment of J.F. Eylar's debts to one Shelton and one Padgitt. The Eylars, therefore, claimed that the conveyance made to O.A. Eylar was in reality and by agreement a mortgage; they gave O.A. Eylar a deed to hold as collateral in exchange for O.A.'s consolidation and repayment of J.F.'s debts.

Meanwhile, O.A. conveyed the property to his mother, Ann Eylar, in return for promissory notes totaling $500. It was against Ann whom J.F. Eylar and his wife asserted their homestead claim, and it was Ann who successfully claimed her status as an innocent purchaser. The court held that while the Eylars' continued possession of the property was sufficient, as it is in all cases, to put purchasers on inquiry notice,

> [w]e are of the opinion, under the facts of this case that a purchaser from O.A. Eylar was not bound to inquire of the appellees [J.F. Eylar and wife] what right they had in the land; that the inquiry was sufficiently prosecuted; prosecuted as far as a prudent man, having a due regard to the rights of others, and to his own protection, would be bound to prosecute it, when he looked to the record and there found that O.A. Eylar was declared by the very persons in possession to be the true and absolute owner of the land.

*Id.* at 320.

However, the court made much of the peculiar facts of the case, especially Ann Eylar's ignorance of the scheme, arranged between J.F. Eylar and O.A. Eylar, to repay Padgitt and Shelton. It observed that J.F. Eylar and his wife paid rent to O.A. Eylar and then to Ann Eylar after she became the owner and found "no evidence that Ann A. Eylar had any actual notice that the deed to O.A. Eylar was intended by the parties to it simply as a mortgage." *Id.* at 318.

In subsequent years, the holding in *Eylar* has been questioned. In *Niland,* we noted a Texas court's conclusion that the rule of *Eylar* was limited by *Moore v. Chamberlain,* 109 Tex. 64, 195 S.W. 1135

(1917). 825 F.2d at 805 n. 3 (citing *Mason v. Olds,* 198 S.W. 1040 (Tex.Civ.App.1917, writ ref'd)). The Rubartses take up this attack on *Eylar* and urge that we instead apply *Moore.* Unlike the court in *Niland,* we therefore find ourselves squarely faced with the issue of *Eylar's* continuing validity.

We conclude that *Moore* and *Eylar* can be read harmoniously and together control this case. In *Moore,* the Chamberlains, owners of the homestead property at issue, conveyed their home via general warranty deed to B.K. Carson in exchange for $4,500 —$3,000 in cash and a $1,500 promissory note. The note was sold to Lou Sue Moore, guardian for Worth Moore, who was told that she was purchasing a vendor's lien note and not lending money secured by a mortgage. That note eventually was substituted for another in the amount of $1,600 and a deed of trust. When the note was not paid, the trustee sold the property to Worth Moore, now older and wisened sufficiently to offset the foreclosure purchase price he agreed to pay with the $1,600 note he had in his possession. However, Mrs. Chamberlain, by then presumably a widow, would not quit the property and brought a suit in trespass to try title, contending that Moore's deed of trust was void *ab initio.*

Following a universal rule of jurisprudence, the court ruled for the widow, holding that

> [w]hen the plaintiff in error purchased the land from the trustee it was in possession of the tenants of the Chamberlains. This placed him upon inquiry, as a matter of law, as to whether the deed from the Chamberlains to Carson, and from Carson to Trammel [a second grantee], were absolute, or were intended only as mortgages. There being no finding that he exercised any diligence by making inquiry, the possession of the tenants constituted actual notice to him that the deeds were intended as mortgages.

109 Tex. at 68, 195 S.W. at 1137.

The apparent inconsistency between *Eylar* and *Moore* concerns the scope of the duty of inquiry placed upon the party as-

serting the validity of the lien. *Eylar*, First Texas contends, stands for the proposition that a third-party purchaser or lender does have a duty of inquiry if the original grantors remain in possession of the property, but that that duty is discharged when the purchaser or lender checks title in the record and discovers what appears to be an absolute conveyance from those grantors. *Moore*, the Rubartses assert, stands for the proposition that the purchaser's or lender's duty of inquiry cannot be discharged by merely relying upon the record of title; instead, the purchaser or lender must undertake a direct inquiry to determine specifically whether the purported conveyance might in fact be a mortgage.

Both positions are correct. The reconciling principle is found in *Eylar*, where the court held that a purchaser's or lender's duty of inquiry must be "prosecuted as far as a prudent man, having a due regard to the rights of others and to his own protection, would be bound to prosecute it." 60 Tex. at 320. Applying this prudent-person standard, the *Eylar* court concluded that a person who had *no actual notice of the mortgage arrangement*, and otherwise had no reason to suspect that the conveyance was less than absolute, was entitled to rely upon the record.

In *Moore*, the court applied the same standard, but declared the consequences that would follow for purchasers or lenders who, like Moore, are found not to have prosecuted their duty of inquiry sufficiently: As a matter of law, the claimant's possession of the property "placed him upon inquiry, as a matter of law, as to whether the deed [was] absolute [or was] intended only as [a] mortgage[ ]. There being no finding that he exercised any diligence by making inquiry, the possession of

the tenants constituted actual notice to him that the deeds were intended as mortgages." 109 Tex. at 68, 195 S.W. at 1137 (citing cases). *See Eylar, id.* at 321 (if purchaser has notice of mortgage agreement, deed of trust lien cannot be enforced).

*Eylar*'s and *Moore*'s prudent-person standard must be further explained in light of other, more general principles of Texas homestead law; thus, the prudent lender, in the context of a potential "sham" conveyance, will not rely upon the representations of husband and wife to the contrary[6]; instead, the lender or purchaser must investigate the circumstances under which the purported sale was made, the status of the purchaser, the arrangements made by the original owners for other housing, or any affirmative actions indicating abandonment. *See Fuller v. Preston State Bank*, 667 S.W.2d 214, 217 (Tex.App.—Dallas 1983, writ ref'd n.r.e.) (homestead claimant's financial difficulties, purported sale of her home to her son, and bank's inspection of property should have excited suspicion of a prudent lender). Only the *actions* of the homestead claimants will lay sufficient grounds for estoppel; their declarations made orally or in writing are insufficient. *See Niland*, 825 F.2d at 808.

■ *Eylar*'s holding thus remains intact, particularly as elucidated by *Moore*: In circumstances in which a lender or purchaser has no reason to suspect that the conveyance is other than absolute and the homestead claimants have undertaken actions, such as the payment of rent as in *Eylar*, that would reaffirm recorded documents evincing such a conveyance, a lien or deed may be enforceable against a homestead claim on the ground that the claimants are estopped from asserting it.[7]

6. *See Niland*, 825 F.2d at 808 (quoting *Blalock*, 76 Tex. at 89, 13 S.W. at 13):

If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead contrary to the fact will enable parties to evade the law and encumber homesteads with liens forbidden by the Constitution.

7. *See* Comment, *Estoppel of Husband and Wife To Claim Constitutional Protection of Their Homestead*, 60 Tex.L.Rev. 76, 83 (1946). The author concludes that "[t]his doctrine of *Eylar v. Eylar* works well in the protection of *innocent* purchasers of vendor's lien notes or the property itself, and has been extended to apply where the deed executed by claimants in the course of the simulated sale is unrecorded but has been delivered to the grantee." *Id.* at 82 (footnotes omitted, emphasis added).

But a lender, although without *actual* notice of a debtor's plan to evade the state's homestead provisions, can be charged with *constructive* knowledge by operation of the duty of inquiry.

Here, the district court found that the Rubartses "did not, by their actions or statements, give notice, actual or otherwise, by [First Texas or the Rubartses' attorney] that Diversified ... would later reconvey the property located at 615 Western Hills ... to themselves." Most importantly, however, the court also found that the Rubartses "secretly intended that the ... conveyance to Diversified ... not be unconditional and absolute. Their true intention was to cause Diversified ... to reconvey said property back to themselves after the loan was obtained and they knowingly concealed this intention from their attorney ... and First Texas...."

Under Fed.R.Civ.P. 52(a), we accept the court's factual findings unless they are clearly erroneous, that is, unless we are "left with a definite and firm conviction that a mistake has been committed...." *NCH Corp. v. Broyles*, 749 F.2d 247, 252 (5th Cir.1985). We do not question the court's finding that First Texas had no *actual* knowledge of the Rubartses' intentions. There was ample testimony, from both the key loan officer and the Rubartses' attorney, from which the court reasonably could have made this finding. On the other hand, the evidence points overwhelmingly to the fact that First Texas had *constructive* knowledge of the Rubartses' plan.

For example, Bobby Rubarts testified that when he first approached the loan officer, Eddie Shadden, proposing to obtain a second mortgage loan on the house to obtain development money for the corporation, Shadden initially said he was not sure that could be done. Shadden's testimony was not to the contrary: He testified that Rubarts "wanted to refinance the indebtedness against his home, which we were very quick to tell him under the laws of the State of Texas that we would not be able to do that because of the Homestead Law.... It was at that point that he asked if it would be permissible to borrow money in the name of his corporation."

It is evident that this meeting was held in the context of a longstanding relationship between the Rubartses and First Texas. They had known the bank officers for many years, and the institution was well aware of their business affairs. It is undisputed that the Rubartses occupied the house as their only residence during the period in question, and there is no suggestion that this fact was ever concealed or was ever less than obvious in the eyes of First Texas or any other party. Nor is there even an assertion that the Rubartses ever hinted at moving from the residence during the relevant period. It was stipulated that the residence was continuously insured in the Rubartses' (not Diversified's) name and that First Texas was named as the mortgagee and loss payee in the policy. It is reasonable to infer that First Texas either received copies of such policy or easily could have obtained the same.

Even more significantly, at the time the loan by Diversified was applied for, Bobby Rubarts, purportedly acting as president of Diversified, was requested by First Texas to execute a form, which First Texas had filled out, entitled "Residential Loan Application." Although the form showed Diversified as the borrower, the "borrower" was also shown as having an age of 44, 16 years of schooling, white race, male sex, married with 4 dependents aged 21, 18, 12, and 7—all accurate personal facts as to Bobby Rubarts personally. Notably, a box was checked on the form indicating that the "purpose of loan" was to "Refinance." Moreover, there is no indication that First Texas requested evidence (nor is there any such evidence) indicating that there was any rental agreement between the Rubartses and Diversified covering use of the house.

From these facts, only one reasonable conclusion can be drawn: that the Rubartses were utilizing the loan to Diversified as a device to obtain a second mortgage for a purpose prohibited by the Texas homestead laws. The fact of this plan was so obvious from, especially, the substance of Ru-

barts's conversations with Shadden and the contents of the application form that First Texas must be charged, as a matter of law, with constructive knowledge of the plan. That plan did in fact exist for, as the district court found, the Rubartses secretly intended the conveyance not to be unconditional and absolute, planned to reconvey to themselves, and knowingly concealed the same from First Texas.

We have noted that in accordance with *Eylar* and *Moore*, such constructive knowledge on the part of First Texas appears sufficient to invoke, for the Rubartses, the protection of the homestead laws. First Texas, however, refers us to a much more recent case, *Eckard v. Citizens Nat'l Bank*, 588 S.W.2d 861 (Tex.Civ.App.—Eastland 1979, writ ref'd n.r.e.). There, as here, a husband and wife occupied property as their homestead, then conveyed it to their wholly-owned corporation. The corporation later defaulted on the note, whereupon the corporation reconveyed the property to the couple.

The jury in *Eckard* concluded that the conveyance was not a " 'pretended sale' for the purpose of placing a lien upon their homestead." *Id.* at 862. The court affirmed a judgment foreclosing a lien in favor of the bank, concluding that "we cannot say the jury's finding is against the great weight and preponderance of the evidence." *Id.* In particular, the court relied upon *Hardie & Co. v. Campbell*, 63 Tex. 292, 295 (1885), which explained as follows:

If it was intended by the parties that the title should vest in appellants by reason of the conveyance, but subject to be divested within the designated time by Campbell paying to appellants the specified amount, then such a transaction would amount to a sale, as contradistinguished from a *pretended* sale. [Emphasis in original.]

Here, of course, the facts are very different from both *Eylar* and *Hardie*. The district court has specifically found that the Rubartses always intended to reconvey the property to themselves at some time after obtaining the loan. In contrast to the scenario described in *Hardie*, the Rubartses' intention was to reconvey after merely *obtaining* the loan; the reconveyance was not even contingent upon repayment in full. Thus, the finding here is tantamount to a finding that the Rubartses were effecting a "pretended sale," the very device specifically prohibited by section 50. In *Eckard*, the finding was directly to the contrary.

The facts here, while different from those in *Eckard*, are similar to those in *McGahey v. Ford*, 563 S.W.2d 857 (Tex.Civ. App.—Fort Worth 1978, writ ref'd n.r.e.). There, as here, the debtors continued to live in the house without payment of rent, having deeded the property to their family-owned corporation in order to borrow money from the company. As in *Hardie*, the intention was to reconvey once the debt was satisfied. The court found ample evidence to constitute a pretended sale and that hence "the property retained its homestead character...." *Id.* at 862.[8]

Given this intent on the part of the debtors, the only remaining inquiry under, e.g., *Eylar* is whether First Texas was entirely an innocent participant or whether, instead, it can be charged with constructive knowledge of the pretended sale. We have answered that question, *supra*, adversely to First Texas. Hence, the state constitutional provision protects the Rubartses from foreclosure in regard to the home in question.

## V.

■ This does not end the matter, however. First Texas claims that even if it cannot foreclose its lien on the Rubartses' home, it is entitled to subrogation. We agree. Specifically, when the loan to Di-

---

8. Noteworthy by way of contrast is *Girard v. Unilife Ins. Co.*, 104 B.R. 817 (Bankr.W.D.Tex. 1989). There, the court held that the sale to a family-held corporation was not a pretended sale but was "a conscious and advised decision" by the debtors. *Id.* at 822. The court relied upon the facts that "[i]nspection of the Property would have led most persons to conclude that the premises were devoted to a construction business [and that the debtors] told [the purchaser] on several occasions that they had relinquished any homestead claim to the property." *Id.*

versified was funded, the sum of $27,402.57 was used to satisfy the then-remaining balance on the existing first mortgage on the home, as to which First Texas was the mortgagee.

The deed of trust executed as part of the loan to Diversified specifically provides for subrogation. Under the terms of that contractual provision, First Texas would be entitled to the benefit of a lien against the property in the amount of $27,402.57. And even if *contractual* subrogation were not available because of the operation of section 50, First Texas would enjoy *equitable* subrogation.

In Texas, subrogation must be decided upon an examination of the facts of each case. *Reliable Life Ins. Co. v. Brown & Root, Inc.*, 607 S.W.2d 621, 630–31 (Tex. Civ.App.—Waco 1980, writ ref'd n.r.e.). Here, there is no question but that the predecessor of First Texas obtained a valid lien at the time of the original mortgage in 1968. That loan was, in every respect, a valid mortgage loan on a residential homestead. By paying off the remaining balance, First Texas should not stand to lose the lien as to that amount, but only as to the additional amount loaned to Diversified when, as we have held, First Texas had constructive knowledge of the Rubartses' intentions.

To that effect, it is well established in Texas that

[o]ne who advances money to pay off an incumbrance on realty at the instance of ... the owner ..., either on the express understanding or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien, is not a mere volunteer, and in the event the new security is for any reason not a first lien ..., the holder of such security, if not chargeable with culpable and inexcusable neglect, will be subrogated to the rights of the prior incumbrances....

*Kone v. Harper*, 297 S.W. 294, 297 (Tex. Civ.App.—Waco 1927), *aff'd sub nom. Ward–Harrison Co. v. Kone*, 1 S.W.2d 857 (Tex.Comm'n App.1928, judgm't adopted). *Accord Sanger Bros. v. Ely & Walker Dry Goods Co.*, 207 S.W. 348, 349–50 (Tex.Civ. App.—Fort Worth 1918, writ ref'd); *Whiteselle v. Texas Loan Agency*, 27 S.W. 309, 313–14 (Tex.Civ.App.1894, writ ref'd); *Lewis v. Investors Sav. Ass'n*, 411 S.W.2d 794, 796 (Tex.Civ.App.—Fort Worth 1967, no writ).

The Rubartses assert that since subrogation is governed by equitable considerations, First Texas must have "clean hands" and that First Texas was, to the contrary, a "willing and knowing partner in the activities which resulted in its payment of the $27,402.57 first lien." However, the district court specifically found that First Texas had no such actual knowledge. Moreover, all that it gains by operation of subrogation is the lien for $27,402.57 that it had prior to the subject questionable transaction. Hence, we conclude that First Texas is entitled to the benefit of such subrogation.

## VI.

Principles of federalism strictly define the scope of our powers of review in a case such as this one; our sole duty is to determine, to the best of our ability, what the state law is and to apply it. The task requires restraint, for we must guard against temptations to substitute our own policy choices for those of the state legislature. Like Judges Politz and Jolly, both of whom specially concurred in *Niland*, 825 F.2d at 816–17, we express some uncertainty as to whether the disposition of this case is the fair and just one: We are hesitant to declare a lien unenforceable in the face of what is most charitably called a "double-cross."

Nevertheless, we harbor no uncertainty as to the result that is required by Texas homestead law: In Texas a lender who is aware of the claimant's continued, actual possession of the property bears a heavy burden in its attempt to escape the reach of the state's homestead provisions. The people of Texas, through their constitution, have determined that in circumstances such as those presented here, debtors may enjoy the benefits of the homestead laws even where they employ devices designed to de-

feat the purposes of those laws. We have no warrant to second-guess that matter of public policy.

The judgment of the district court is REVERSED, and this matter is REMANDED for further proceedings in accordance herewith.