**BIOCORE, INC., et al., Plaintiffs,**

v.

**Hamid KHOSROWSHAHI, Defendant.**

**Hamid Khosrowshahi, Plaintiff,**

v.

**BioCore, Inc., et al., Defendants.**

**Nos. Civ.A. 98–2031–KHV, Civ.A. 98–2175–KHV.**

United States District Court, D. Kansas, Kansas City Division.

Dec. 31, 1998.

. Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, pro se.

Thomas A Butler, Butler, Fitzgerald & Potter, PC, New York City, pro se.

Timothy F Butler, New York City, pro se.

Maragaret Callaci, Tarrytown, NY, pro se.

Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Ryan Bernard Denk, Fairway, KS, Joseph W. Hemberger, McAnany, Van Cleave & Phillips,

P.A., Kansas City, KS, Michael M. Shultz, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for plaintiffs.

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, pro se.

Hamid Khosrowshahi, Tarrytown, NY, pro se.

Ronald C. Newman, Topeka, KS, Gerald L. Rushfelt, Kansas City, KS.

*MEMORANDUM AND ORDER*

VRATIL, District Judge.

On November 12, 1998, Hamid Khosrowshahi filed *Defendants' Daubert Motions To Preclude The Testimony Of Plaintiffs' Expert Witnesses* (Doc. # 428). At a status conference on December 14, 1998 the Court overruled that motion but entered various orders to show cause why the testimony of plaintiffs' expert, David Cochran, should not be stricken. The matter now comes before the Court on *Plaintiffs' Response On Orders To Show Cause* (Doc. # 496) filed December 21, 1998. The parties are fully familiar with Cochran's expert report and in addressing the issues raised by plaintiffs' response to the orders to show cause, the Court will not burden the record by elaborate discussion of it.

1. Method One

Cochran employs two methods of computing lost profits. Method One, which produces a lost profit claim of $105,614,236 for 1999 through 2006, depends entirely on sales projections for 1999 through 2002 for Integra LifeSciences Corporation. Cochran takes the Integra projections (which are for Viaderm, an avian-based collagen product which Integra never put on the market and which differs from plaintiffs' bovine-based collagen product) and extrapolates them to reflect Viaderm sales through 2006.[1] Method One makes several key assumptions:

First, that the market for collagen wound products is static and that plaintiffs will have no competition except Integra, so that every sale made by Integra is a sale lost to plaintiffs. In actuality, the record suggests that the market is anything but static,[2] and plaintiffs now have 25 competitors and 64 competing products.

Second, not only that Integra's sales projections are reasonable for 1999 through 2002, but also that Cochran can reasonably extrapolate them from 2003 through 2006. In fact, Viaderm has never been marketed, so none of the projections can be tested, and the record is devoid of evidence regarding the wound care industry (and the respective roles of Integra and BioCore in it) which would independently justify the sales projections through 2003.

Third, that Integra is in the market, or will be, effective January 1, 1999.[3] The record, however, contains no such evidence.

On this record, the Court was concerned that the evidence to be produced at trial would not permit the jury to reasonably agree that the relevant market is static; that every sale made by Integra would be a sale lost to plaintiffs; that Integra's untested sales projections (for a product different than plaintiffs') would afford a reasonable basis for calculating damages; or that Integra is

1. According to Khosrowshahi and Integra, Integra abandoned the Viaderm product between October of 1997 and January of 1998. According to plaintiffs, it is "highly doubtful" that Integra dropped the product; plaintiffs claim that Integra could have run clinical testing as late as October of 1998.

2. The Court cannot determine whether the market is expanding or shrinking, but it appears to be in flux. Cochran assumes that the total market for relevant wound care products will grow at a minimum rate of eight percent per year. He assumes in Method Two that plaintiffs' market share will increase at the rate of 34.5 percent per quarter, or 558.7 percent per year. Khosrowshahi predicted, however, in September of 1997, that a possible lack of availability of collagen raw materials for medical application would make it impossible for companies who do not produce their own collagen to continue to produce collagen based wound dressings. Plaintiffs have not cited record evidence regarding these factors or other factors that would factually justify the Integra projections for Viaderm.

3. While plaintiffs argue that Method One does not depend on whether Integra actually enters the market, plaintiffs in fact will suffer no damages under a lost profits theory if Integra is not in the market.

going to enter the relevant market on January 1, 1999—or ever. Absent such evidence the Court feared that Cochran's opinion would not assist the jury in understanding the evidence and determining the amount of damages, see Fed.R.Evid. 702, and that the probative value of his opinion would be outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay and waste of time under Fed.R.Evid. 403. The Court therefore ordered plaintiffs to show cause in writing on or before December 21, 1998 why Cochran's opinion as to Method One should not be barred for lack of evidentiary support.

In response to the Court's concern that the relevant market is not static and that as a matter of basic economics Cochran cannot reasonably assume that every sale made by Integra will be one lost to plaintiffs, plaintiffs concede that "it is certainly possible that not every Integra sale would replace a Biocore sale." They nonetheless argue that "the intent of Integra was to market a product that directly competed with the BioCore product" and thus to "take sales from BioCore and not other manufacturers." In support of this position, plaintiffs cite evidence that Integra hired Khosrowshahi to "begin execution of an operating plan for a collagen-based wound care business," see Exhibit A to *Plaintiffs' Response On Orders To Show Cause* (Doc. # 496) [Plaintiffs' Ex. A].[4]

In response to the Court's concern that Integra's untested sales projections do not afford a reasonable basis for calculating damages, plaintiffs respond that (1) Khosrowshahi prepared the Integra projections and he should not be allowed to impeach his own report; and (2) even though Viaderm never went on the market, there is no reason to believe that Integra's projections are unreasonable. As to the first point, plaintiffs do not cite Fed.R.Evid. 801(d)(2) or expressly argue that the Integra projections represent an admission by Khosrowshahi.[5] They have failed to provide the Court a copy of the alleged projections and they cite no affidavits or other record evidence from which the Court might find that the projections would be admissible in evidence under any legal theory. In fact, though plaintiffs allege that Khosrowshahi prepared the projections, they cite no evidence of that alleged fact. As to plaintiffs' argument that there is "no reason to believe that [the] projections ... are unreasonable," plaintiffs misconceive their evidentiary burden as a proponent of the evidence.[6] The projections concern a different type of product than plaintiffs' product, and they are totally untested because Integra never marketed its product. These naked facts, standing alone, raise substantial questions concerning the relevance of the evidence and the reliability of the projections. On this record those questions cannot be resolved in plaintiffs' favor.

Finally, in response to the Court's stated concern that plaintiffs lack evidence that Integra is going to enter the relevant market on or after January 1, 1999, plaintiffs ask that they be allowed to prove that Integra is

---

4. Plaintiffs also cite evidence that Khosrowshahi suggested that Integra investigate the pH levels of Medifil and arranged for Integra to secure samples of Medifil for a control study, and that in September of 1997, Integra investigated the relative properties of Medifil. Unfortunately, plaintiffs offer no explanation regarding what Medifil is or how (if at all) it relates to this case. Even if the Court were to assume that Medifil is a BioCore product and that Viaderm attempted to emulate it, the evidence which plaintiffs cite falls far short of substantiating the proposition that Integra is capable of marketing a collagen wound care product that will displace BioCore from the market. See Exhibits B and C to *Plaintiffs' Response On Orders To Show Cause* (Doc. # 496) [Plaintiffs' Exs. B & C].

5. Under Rule 801(a)(2), "a statement is not hearsay if it is offered against a party and is (A) the party's own statement in either an individual or representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship...."

6. Plaintiffs assert that "[t]he question is whether the calculations would be used by reasonable business men [sic] in the ordinary course of conducting their business affairs" and that "clearly, Integra used the figures in that manner." Again, however, plaintiffs cite no record evidence in support of this position.

"poised" to enter the market in direct competition with BioCore. As noted above, the record contains not one iota of direct evidence that Integra plans to enter BioCore's market in the foreseeable future.[7] Plaintiffs' entire theory is based on speculation that Integra is "poised" to enter the market; that even if Integra does not enter the market, someone else will;[8] that either way, BioCore will sustain devastating injury; and that even if *no one* markets a competing product, BioCore will sustain losses in the "hundreds of millions of dollars." Unfortunately, however, plaintiffs have cited no record evidence from which a jury might reasonably agree that Integra plans to enter the market; that Integra has communicated BioCore trade secrets to third parties; that third parties plan to enter the market; or that *anyone* is capable of replicating or marketing BioCore products, with or without access to its alleged trade secrets. In sum, no reasonable jury would agree with plaintiffs that "it is clear today, that BioCore will not be able to realize the profits that it would otherwise expect because Integra or some other company will be able to capture a substantial percentage of the market share now maintained by Bio-Core."

■ The notes of the advisory committee make clear that Fed.R.Evid. 402 is limited by Fed.R.Evid. 403 and by the rules contained in Article VII of the Federal Rules of Evidence, including Fed.R.Evid. 702. The touchstone of Fed.R.Evid. 702, as noted above, is the helpfulness of the expert testimony, *i.e.* whether it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Downing,* 753 F.2d 1224, 1235 (3d Cir.1985). The Court therefore must determine whether the proffered evidence would be helpful to the trier of fact, although doubts should be resolved in favor of admissibility. *In re "Agent Orange" Product Liability Litiga-*

tion, 611 F.Supp. 1223, 1241 (E.D.N.Y.1985); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 279 (3d Cir. 1983), *cert. granted,* 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985); *see also Kline v. Ford Motor Co., Inc.,* 523 F.2d 1067, 1070 (9th Cir.1975) (within discretion of trial judge to determine whether expert opinion on causal connection between defects in steering column and auto accident was helpful). The requirement that expert testimony "assist the trier of fact" is a condition that goes primarily to relevance. *Miller v. Heaven,* 922 F.Supp. 495, 501 (D.Kan.1996). Specific subject areas of proposed expert testimony must therefore be examined to ascertain whether each is sufficiently tied to the facts of the particular case that they will be helpful to the trier of fact. *United States v. Norwood,* 939 F.Supp. 1132, 1136 (D.N.J.1996). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02], p. 702–18.

■ Having examined the record in this case, the Court finds for the reasons stated above that Cochran's opinion will not help the jury to understand the evidence or determine a fact in issue, see Fed.R.Evid. 702, because it does not sufficiently relate to any factual issues which the jury will decide. The probative value of Cochran's opinion as to Method One is outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay and waste of time under Fed. R.Evid. 403 and the Court finds that it should be excluded.

2. Method Two

■ Method Two—which estimates lost profits at $241,190,380—rests on the premise that in 1997, plaintiffs suffered lost sales of

---

**7.** Plaintiffs' only "evidence" is circumstantial, and it consists of the possibility that Integra may be lying both when it claims that it switched from a bovine collagen product (like BioCore's) to an avian collagen product (Viaderm), and when it claims that it has abandoned its effort to develop a competing product. Plaintiffs have no evidence that Integra *is* lying; they simply hope the jury will disbelieve it.

**8.** Plaintiffs allege that "there is no telling when some other company will begin producing and marketing products based upon BioCore's trade secrets." They cite no evidence, however, that any other company has access to BioCore trade secrets.

$4,611,577 and that 85 percent of the loss was attributable to Khosrowshahi. In making his calculations, Cochran assumes that sales should have increased 34.5 percent per quarter in 1997, for a total annual increase of 558.7 percent, even though historic figures reveal actual increases of 46.7 percent (from 1994 to 1995), 87.6 percent (from 1995 to 1996), and 82.3 percent (from 1996 to 1997).[9] In addition, Cochran appears to have double counted losses attributable to "1996 customers with no 1997 purchases." Finally, Cochran attributes 85 percent of all losses to Khosrowshahi, based on the opinion of plaintiffs' management. Nothing in the evidence of record suggests that these assumptions are reasonable—or that a jury could find them to be reasonable, based on admissible evidence. The Court therefore ordered plaintiffs to show cause in writing why Cochran's opinion as to Method Two should not be barred from evidence because it lacks a factual foundation.[10]

Plaintiffs make no persuasive response to the Court's concerns. As to the fact that Cochran assumes a 1997 growth rate of 558.7 percent, despite an all-time previous high of 87.6 percent, plaintiffs state only that "BioCore is a relatively new company that only really started to take off in 1996 and the first half of 1997" and that it would be "unfair to examine BioCore sales figures previous to 1997 since they would unduly negatively affect the average sales figures." Plaintiffs also assert that "no one can suggest why the sales increases in 1997 are not a reasonable basis for projections within the range of acceptable error." The problems with this response are many. First, plaintiffs' statements are not supported by record evidence. Nothing about the BioCore product, plaintiffs' expenses and sales history, or conditions within the market as a whole suggests that BioCore could reasonably expect a

growth rate of 558.7 percent for 1997. No expert has opined that such predictions are reasonable, given the market for BioCore products, and they do not pass either the smell test or the laugh test.

Plaintiffs offer no explanation for the fact that Cochran appears to have double counted losses for sales lost from 1996 customers who made no purchases in 1997.

As to the fact that Cochran attributes 85 percent of the lost profits to Khosrowshahi, based on nothing more than opinion of management, plaintiffs state only that (1) it is reasonable for Cochran to rely on BioCore management for such figures and (2) it is reasonable for BioCore management to make such calculations, based on their personal knowledge and expertise in their own business and the marketing of collagen products. Plaintiffs do not pretend to cite record evidence in support of these positions. Nor do they explain how management's opinion is based on "personal knowledge and expertise," or what BioCore management did to arrive at this figure. On this record, plaintiffs' attribution is not shown to represent anything but a number pulled from thin air.

For these reasons, applying the law previously stated, the Court finds that Cochran's opinion will not assist the jury in understanding the evidence and determining the amount of damages, see Fed.R.Evid. 702, and that the probative value of his opinion as to Method Two is outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay and waste of time under Fed.R.Evid. 403.

### 3. Unjust Enrichment

On the unjust enrichment theory of damages, Cochran calculates that plaintiffs incurred $11,714,673 in product development

---

9. BioCore was formed in 1988 but it had no sales until 1991. Cochran does not consider sales for 1991 through 1994.

10. For example, the Court was concerned that the jury would never hear admissible evidence that Khosrowshahi was responsible for 85 percent of plaintiffs' lost profits in 1997. Lay opinion is admissible under Fed.R.Evid. 701 only where "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of the fact in issue." The Court cannot imagine what testimony by BioCore management would meet this test, and plaintiffs have suggested none. Similarly, even with respect to Fed.R.Evid. 703, the record contains no evidence that certified public accountants would reasonably rely on such lay opinions in forming opinions or inferences anywhere outside the litigation arena.

costs and that a BioCore competitor could enter the market without incurring those costs. Cochran reaches his damage estimate by adding various figures from plaintiffs' tax returns (1988 through 1995), a 1996 internal financial statement, a 1997 financial compilation, and an interrogatory answer.[11] Cochran did not prepare any of the tax returns. He did not audit or review any of the financial information, or attempt to confirm it for accuracy or completeness. He relied solely on information provided by BioCore management and his opinions are expressly contingent upon the financial and other information which it provided.

Cochran's report appeared to be nothing more than a mathematical computation which the jury was fully capable of performing on its own. The Court therefore ordered plaintiffs to show cause in writing why his opinion should not be barred because it is not based upon scientific, technical or other specialized knowledge that will assist the trier of fact to determine any fact in issue, and why the Court should not find that the probative value of Cochran's opinion is outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay and waste of time under Fed.R.Evid. 403.

Plaintiffs respond that by training and professional experience, a certified public accountant is competent to testify on the meaning of complex financial data and that Cochran's testimony is important for several reasons: (1) he will explain why the figures listed are "relevant to determine the true R & D costs" and (2) only an expert can testify as to the meaning of certain categories of expenditures.[12] In summary, plaintiffs admit that while one does not need an accounting degree to add up the numbers which comprise the unjust enrichment estimate,

"one must have expert knowledge to know why the figures are included in the first place and to explain the meaning of the entries."

Expert testimony may be deemed not helpful "when offered to explain an issue or fact that the average person can understand by the use of common knowledge or common sense." 4 *Weinstein's Federal Evidence* § 702.03[3] (Matthew Bender 2d ed.); *United States v. Montas,* 41 F.3d 775, 783–784 (1st Cir.1994) (expert testimony "about matters that were readily intelligible" is unhelpful to jury and thus inadmissible). Under Fed.R.Evid. 702, however, "an expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding." S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 451 (3d ed.1982). See also Notes of Advisory Committee on Proposed Rule 702 (quoting Ladd, *Expert Testimony,* 5 Vand.L.Rev. 414, 418 (1952)); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 702[02], at 702–12 n. 6 (citing cases). *Cf. Breidor v. Sears, Roebuck and Co.,* 722 F.2d 1134, 1138 (3d Cir. 1983) (district court has broad discretion to admit or exclude expert evidence, and its action will be sustained unless manifestly erroneous); *Knight v. Otis Elevator Company,* 596 F.2d 84, 87 (3d Cir.1979) (noting liberal policy of admitting expert testimony which will "probably aid" the trier of fact). Consistent with the liberal standard of admissibility mandated by Rule 702, the Court concludes that Cochran should be allowed to testify regarding the unjust enrichment theory of recovery.

IT IS SO ORDERED.

---

11. Cochran adds expenses for research and development, startup expenditures, consulting fees, telephone/communications, travel, capitalized intangible "research & development," advertising, professional fees, legal fees—stock issuance, travel/meals/entertainment, marketing expense, literature/sales aids, printing costs, convention/exhibit expenses, 1988–1991 expenses other than listed elsewhere, AA investment in cattle facility, AB value of research & development and other related startup costs performed by Dr. Ma-

noj K. Jain, and reimbursements and grants received.

12. Plaintiffs cite one example of the need for expert testimony: to explain a $1,900 entry for "Capitalized Intangible 'Research & Development.'" Plaintiffs also reference "item Z" on page 3 of Exhibit H, and "Sched. M1, statement 2: Sec 267 Interest Expense."