In re James Albert JAY, Debtor.

James Albert Jay and Ann C. Jay, Plaintiffs,

v.

Nesco Acceptance Corporation, Nesco, Inc., Bank One, Oklahoma, N.A., and Linc Acquisition One, L.L.C., Defendants.

Bankruptcy No. 01–11000–RLJ–13.
Adversary No. 02–1009.

United States Bankruptcy Court,
N.D. Texas,
Abilene Division.

March 10, 2004.

Sammy Clay Gregory, Lubbock, TX, Jim Parker, Comanche, TX, for Plaintiffs.

James R. Jordan, Shannon, Gracey, Ratliff and Miller, Dallas, TX, John Y. Bonds, III, Shannon, Gracey, Ratliff and Miller, Ft. Worth, TX, Matthew M. Julius, Dallas, TX, for Defendants.

## *MEMORANDUM OPINION*

ROBERT L. JONES, Bankruptcy Judge.

The claims raised by this adversary proceeding were, at the parties' request, bifurcated for trial. The court first held a hearing on July 23, 2003, and heard evidence on the claim by James Albert Jay and Ann C. Jay, the plaintiffs, seeking cancellation of the deed purportedly conveying a .85–acre tract of land, which they claimed as their business homestead, to Defendant Nesco Acceptance Corporation. The Jays argued that the transaction was a pretended sale of their business homestead in violation of the Texas Constitution. The court issued its memorandum opinion on September 30, 2003, holding that the transaction was a pretended sale of a business homestead and, under equity, converting the deed to an improper mortgage lien against the Jays' business homestead. The court held that Nesco therefore held an unsecured claim, evidence on which was to be submitted at the second trial.

Trial on all other issues raised by the adversary was held December 8 and 9, 2003, with the parties submitting post-trial briefs on December 19, 2003. The issues raised by the second trial concern the amount of Nesco's claim; the Jays' claim for damages arising from their remaining causes of action alleging fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and breach of contract; and the claim of Defendant Linc Acquisition One, L.L.C. ("Linc"), a lienholder against the property, that it is a bona fide lienholder against the property. *See* Joint Pre–Trial Order entered October 21, 2003. Defendants Nesco Acceptance

Corporation and Nesco, Inc. (collectively "Nesco"), in response to the Jays' damage claims, contend that such claims must fail because of Nesco's affirmative claims of past-due rent, an implied vendor's lien, restitution, quantum meruit, cancellation of the lis pendens filed by the Jays; and because of Nesco's defenses, including estoppel, contributory negligence and failure to mitigate.

Defendant Linc asserts it is not subject to the business homestead claim of the Jays as an innocent purchaser for value and in good faith. Linc acquired the lien from Defendant Bank One, Oklahoma, N.A. ("Bank One"), which had been granted a deed of trust lien against the property to secure a loan made to Nesco.[1]

The court will first address Linc's bonafide lienholder claim, followed by the Jays' claim for damages arising from the issues considered at the second trial. The court will then address the liquidation of Nesco's claim. Finally, the court addresses and corrects its holding regarding a separate tract, the 1.04–acre tract, that was also subject of the parties' transaction. The court attaches and hereby incorporates the statement of facts from the prior memorandum opinion. The court will address additional facts as necessary.

### Linc's Bonafide Lienholder Claim

The court made very brief findings regarding the position of Linc in the prior memorandum opinion. Additional evidence was submitted on this issue at the second trial. There is no dispute concerning the facts: Nesco, Inc. is obligated on a construction note dated June 27, 2001, and made payable to Bank One in the amount of $8 million. The note is secured by the .85–acre tract (with improvements) granted under a deed of trust also dated June 27, 2001.

Bank One conveyed its interests in the Nesco note and deed of trust to Linc by assignment dated November 1, 2002. On September 23, 2002, after the Nesco/Bank One transaction and before the Bank One/Linc transaction, the Jays filed a lis pendens covering both the .85–acre tract and the 1.04–acre tract. The lis pendens placed Linc on notice of the Jays' claims against Nesco concerning the properties.

▮ Linc contends that its lien survives the Jays' homestead claim because it succeeds to the position of Bank One which, Linc argues, is an innocent lienholder. This is premised on the so-called shelter rule that provides that once a purchaser takes title to land without notice of an adverse party's claim, subsequent purchasers for value in the chain of title are protected, regardless of their knowledge of a claim by an adverse party. *See Omohundro v. Jackson*, 36 S.W.3d 677, 682 (Tex.App.—El Paso 2001). As a general principle of real property law, this rule applies in the context of land previously involved in a pretended sale. *See Price v. Reeves*, 91 S.W.2d 862, 865 (Tex.Civ. App.—Fort Worth 1936, writ dism'd w.o.j.); *Gore v. Citizens State Bank*, 88 S.W.2d 721, 721–22 (Tex.Civ.App.—Waco 1935, writ ref'd); *Moore v. Chamberlain*, 109 Tex. .64, 195 S.W. 1135, 1136 (1917). Accordingly, the validity of Linc's lien turns on whether Bank One held a valid lien as an innocent lender.

---

1. The court considered this issue at the prior trial and addressed it in its memorandum opinion. The matter was resolved in favor of the Jays because of Linc's failure to carry its burden on the question. The issue was reopened upon motion by Nesco. The Jays, through counsel, candidly admitted that they had agreed to litigate this issue during the second phase of the bifurcated proceedings. The court certainly appreciates the candor and fairness represented by counsel.

■ As discussed in depth in this court's prior opinion, when a purported sale of homestead property is held to actually constitute an otherwise impermissible loan under the Texas Constitution, the purported conveyance is void and the purported buyer holds an unsecured debt for the amount loaned to the purported seller. *See Johnson v. Cherry,* 726 S.W.2d 4, 5–8 (Tex.1987). However, a subsequent purchaser of the property from the purported buyer will prevail over the homestead claimant (also referred to herein as "purported seller") if the subsequent purchaser was a purchaser for value without knowledge of the facts giving rise to the purported seller's homestead claim. *Red River Nat. Bank in Clarksville v. Latimer,* 110 S.W.2d 232, 237 (Tex.Civ.App.—Texarkana 1937, n.w.h.); *Walter Connally & Co. v. Gaston,* 295 S.W. 953, 954–55 (Tex.Civ.App.—Texarkana 1927, writ dism'd w.o.j.). Upon such a showing, the homestead claimant is estopped from invoking the claim of homestead against the subsequent purchaser. *Id.* This protection is not based on a statutorily created right or otherwise found in the homestead provisions of the Texas Constitution; it is an equitable protection based on the principle of estoppel. *See id.; Engell v. Union Cen. Ins. Co. of Cincinnati, Ohio,* 81 S.W.2d 738, 739 (Tex.Civ.App.—Fort Worth 1935, n.w.h.).

■ The same protections are afforded to an innocent lender who extends credit to the purported buyer without knowledge of the facts underlying the purported seller's homestead claim. *Patterson v. F.D.I.C.,* 918 F.2d 540, 546–47 (5th Cir. 1990); *Ketcham v. First Nat'l Bank of New Boston, Texas,* 875 S.W.2d 753, 756 (Tex.App.—Texarkana 1994, no writ); *Fuller v. Preston State Bank,* 667 S.W.2d 214, 217 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *National Bond & Mortgage Corp. v. Davis,* 60 S.W.2d 429, 434 (Tex.Comm'n App.1933) ("it was never intended by the framers of the Constitution that the homestead law should be used to defeat the rights of an innocent third party, who, in good faith, without notice, for a valuable consideration, has acquired valid liens against the property"). A lien resulting from such a loan is enforceable against the homestead claimant as long as the lender can meet its burden of proving that the lender had no knowledge of the factual basis used by the court to treat the purported sale as an intended loan. *Id.* The issue of whether the lender was without such notice is a question of fact. *See Ketcham,* 875 S.W.2d at 756; *Fuller,* 667 S.W.2d at 217.

At trial, the parties stipulated to the admissibility of the following answers to interrogatories by Bank One representatives regarding the loan from Bank One to Nesco:

QUESTION: Did Bank One, Oklahoma, NA have notice of any claim by the plaintiffs, James Albert Jay and Anne C. Jay, that the real estate described in the Deed of Trust dated June 27, 2001 executed by Nesco, Inc. to Barbara D. Christian, Trustee, for the benefit of Bank One, Oklahoma, NA recorded as document number 2102251 in the real estate records of Eastland County, Texas, was the Jays' homestead prior to Bank One, Oklahoma, NA receiving the Deed of Trust?

ANSWER: No.

QUESTION: Did Bank One, Oklahoma, NA have notice of any claim by the plaintiffs, James Albert Jay and Anne C. Jay, that Nesco, Inc.'s title to the real estate described in the Deed of Trust dated June 27, 2001 executed by Nesco, Inc. to Barbara D. Christian, Trustee, for the benefit of Bank One, Oklahoma, NA recorded as document number

2102251 in the real estate records of Eastland County, Texas, had been challenged by the Jays as arising out of a sham transaction, pretended sale or other void or voidable conveyance prior to Bank One, Oklahoma, NA receiving the Deed of Trust?

ANSWER: No.

QUESTION: Did Bank One, Oklahoma, NA have notice of any facts or allegation which, if true, would invalidate Nesco, Inc.'s title to the real estate described in the Deed of Trust dated June 27, 2001 executed by Nesco, Inc. to Barbara D. Christian, Trustee, for the benefit of Bank One, Oklahoma, NA recorded as document number 2102251 in the real estate records of Eastland County, Texas, prior to Bank One, Oklahoma, NA receiving the Deed of Trust?

ANSWER: No.

QUESTION: At the time it received the Deed of Trust dated June 27, 2001 executed by Nesco, Inc. to Barbara D. Christian, Trustee, for the benefit of Bank One, Oklahoma, NA recorded as document number 2102251 in the real estate records of Eastland County, Texas, did Bank One, Oklahoma, NA believe in good faith that Nesco, Inc. owned fee simple title to the real estate described in said Deed of Trust?

ANSWER: Yes.

QUESTION: At the time it received the Deed of Trust dated June 27, 2001 executed by Nesco, Inc. to Barbara D. Christian, Trustee, for the benefit of Bank One, Oklahoma, NA recorded as document number 2102251 in the real estate records of Eastland County, Texas, did Bank One, Oklahoma, NA believe in good faith that the warranty of title, contained in Section 1.2 of said Deed of Trust, created a valid lien on the real estate described therein for the benefit of Bank One, Oklahoma, NA?

ANSWER: Yes.

The answers are self-explanatory. They reveal that Bank One had no actual knowledge of the factual basis used by the Jays to challenge Nesco's ownership of the .85–acre tract. The interrogatory answers are the only evidence of Bank One's knowledge.

Linc submits that Bank One's lack of knowledge and its good faith in obtaining its lien resolves the issue in Linc's favor. In doing so, Linc cites to several cases that address the rights of bona fide purchasers or lienholders following a pretended sale of a homestead, including *Eylar v. Eylar*, 60 Tex. 315 (1883) and *First Savings & Loan Ass'n of El Paso v. Avila*, 538 S.W.2d 846 (Tex.Civ.App.1976, writ ref'd n.r.e.). Both *Eylar* and *First Savings* can be read to support Linc's position. Linc fails to recognize the more recent Fifth Circuit opinion, *Matter of Rubarts*, 896 F.2d 107 (5th Cir.1990), which further refines the law on this subject.

In *Rubarts*, Bobby and Naomi Rubarts had a loan with First Texas Savings Association ("First Texas") that was secured by their home, the loan having financed the construction of their home. *Id.* at 108. Eleven years later, the Rubartses, as part of a transaction to obtain another loan from First Texas for development of other property they owned, conveyed their house to their wholly-owned corporation, Diversified Industries, Inc., which, in turn, pledged the house to First Texas to secure the loan. *Id.* at 108–09. First Texas therefore held both a first lien and a second lien against the property. *Id.* at 109. The Rubartses then caused the home to be reconveyed to them. *Id.* at 109. The Rubartses continued to occupy the house throughout. *Id.* The Rubartses claimed that the deed of trust in favor of First Texas was invalid as it violated the homestead provisions of the Texas Constitution.

*Id.* First Texas contended that the Rubartses were estopped from asserting their homestead claim because of their absolute conveyance of the property. *Id.* at 110. While the Fifth Circuit found that First Texas was subrogated to the extent its loan was used to satisfy its prior valid lien, it also held the Rubartses' execution and recordation of a deed conveying their residence to their wholly owned corporation was insufficient to estop them from asserting their homestead claim as against First Texas. *Id.* at 115.

In its opinion, the Fifth Circuit addressed the two old Texas Supreme Court cases of *Eylar v. Eylar*, 60 Tex. 315 (1883) and *Moore v. Chamberlain*, 109 Tex. 64, 195 S.W. 1135 (1917). *Id.* at 110–13. The court recognized that *Eylar* stands for the proposition that

> a third-party purchaser or lender does have a duty of inquiry if the original grantor is remaining in possession of the property, but that such duty is discharged when the purchaser or lender checks title in the record and discovers what appears to be an absolute conveyance from those grantors.

*Id.* at 112. The court then turned to the seemingly opposite holding of *Moore*, the court there stating that the "purchaser's or lender's duty of inquiry cannot be discharged by merely relying upon the record of title; instead, the purchaser or lender must undertake a direct inquiry to determine specifically whether the purported conveyance might in fact be a mortgage." *Id.* The Fifth Circuit reconciled the two cases, stating as follows:

> Both positions are correct. The reconciling principle is found in *Eylar*, where the court held that the purchaser's or lender's duty of inquiry must be "prosecuted as far as a prudent man, having a due regard to the rights of others and to his own protection, would

be bound to prosecute it." ... Applying this prudent-person standard, the *Eylar* court concluded that a person who had no actual notice of the mortgage arrangement, and otherwise had no reason to suspect that the conveyance was less than absolute, was entitled to rely upon the record.

In *Moore*, the court applied the same standard, but declared the consequences that would follow for purchasers or lenders who, like Moore, are found not to have prosecuted their duty of inquiry sufficiently: As a matter of law, the claimant's possession of the property "placed him upon inquiry, as a matter of law, as to whether the deed [was] absolute [or was] intended only as [a] mortgage[ ]. There being no finding that he exercised any diligence by making inquiry, the possession of the tenants constituted actual notice to him that the deeds were intended as mortgages."

*Id.* (internal citations omitted).

The court elaborated on *Eylar's* and *Moore's* prudent-person standard in light of Texas homestead law. *Id.* The court noted that "a prudent lender under such circumstances must investigate the circumstances under which the purported sale was made, the status of the purchaser, the arrangements made by the original owners for other housing, or any affirmative actions indicating abandonment." *Id.* (citing *Fuller v. Preston State Bank*, 667 S.W.2d 214, 217 (Tex.App.—Dallas 1983, writ ref'd n.r.e.)). The court held that:

> In circumstances in which a lender or purchaser has no reason to suspect that the conveyance is other than absolute and the homestead claimants have undertaken actions, such as the payment of rent as in *Eylar*, that would reaffirm recorded documents evincing such a conveyance, a lien or deed may be enforceable against a homestead claim on the

ground that the claimants are estopped from asserting it. But a lender, although without *actual* notice of a debtor's plan to evade the state's homestead provisions, can be charged with *constructive* knowledge by operation of the duty of inquiry.

*Id.* at 112–13 (footnote omitted).

■ From the principles stated by the Fifth Circuit in *Rubarts,* this court concludes that a homestead claimant's possession of property imposes upon the third-party purchaser or lender a duty of inquiry that is not automatically discharged by merely checking the record title. In this case, the evidence establishes that Bank One had no *actual* notice of the Jays' claim, but there is no evidence of Bank One making *any* inquiry regarding the Jays or the circumstances concerning their conveyance of the property to Nesco. In fact, there is no evidence that Bank One even checked the record title. The Jays were in possession of the convenience store at the time Bank One obtained its lien. The question is whether Bank One would have been placed on constructive knowledge of the Jays' claim had it fulfilled its duty of inquiry. *See id.* at 113. Linc's claim is, at bottom, based on an estoppel theory, *i.e.* that the Jays are estopped to assert their homestead rights because Bank One had no knowledge of the Jays' claim. The burden lies with Linc, however. *Id.* at 110. Linc had the burden of demonstrating that its predecessor, Bank One, was an innocent lienholder and therefore had the burden of establishing Bank One's "innocence" by showing that Bank One discharged its duty of inquiry in light of the Jays' possession. Linc failed to carry its burden because there is no showing made that Bank One prosecuted its duty of inquiry to the extent a prudent man would to protect his own rights and the rights of others. *Id.* at 112.

Accordingly, the Jays are not estopped and Linc's claim for derivative protection must fail.

### The Jays' Damage Claims

As stated, the Jays allege fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and breach of contract. No evidence was presented that raises an issue of fraudulent inducement, fraudulent misrepresentation, or negligent misrepresentation. The remaining claims on which evidence was proffered are breach of contract claims.

The Jays contend that Nesco failed to honor its obligations as follows:

1. Nesco failed to loan $100,000 it promised for working capital.

2. Nesco failed to build the convenience store in accordance with the agreed-upon plans.

3. The convenience store was not completed by April 1, 2000, as promised.

4. There were defects in the construction: the steel joists were the wrong size, which compromised the structure; undefined defects that somehow caused water to drain into the fuel tanks; and the facility was built over a main water line.

#### (1) Failure to Loan the $100,000

■ First, the Jays contend that $100,000 was still to be advanced as part of the loan of $150,000 promised by Nesco. There is no dispute that $50,000 had been advanced. As for the balance, the court finds that Nesco's obligation was satisfied. The August 30, 2000, letter from Jays' counsel to Nesco states as follows:

As part of their arrangement with you the Jays were to receive $150,000.00 for inventory and working capital, less $26,204.48 to cover first and last months' rent, but to date the Jays have received

only $50,000.00 from you. Please take this as demand for immediate payment of the balance due of $73,795.52. We trust you can appreciate the cash flow bind this non-payment has placed the Jays in, and the you will understand why we feel we have no recourse but to demand interest on the balance due beginning September 1 and to advise that in the event the Jays do not receive these funds immediately they will not be making rent payments and you are instructed to deduct the rent as it becomes due from the monies you owe the Jays.

Pls.' Ex. 9. It is not disputed that Nesco failed to loan the additional $73,795.52 referred to in the letter. But, as evidenced by the August 30, 2000 letter, the Jays elected to offset their rental payment obligation against the unfunded loan amount.[2]

(2) Failure to Build as Per Plans

Second, the Jays contend that Nesco basically built the wrong building by failing to construct it in accordance with their plans. They contend that the plans for the building called for a forty foot wide building. According to the Jays, the building was to be approximately sixty feet by forty feet. Instead, it is approximately thirty-six feet by seventy-two feet. The additional four feet in width is needed, the Jays argue, to allow maximum use of the facility. The evidence reveals there were three sets of plans for the store. The first set of plans was obtained from Food Store Ser-

vice Company of Fort Worth, Texas. This company was contacted by the Jays prior to the Jays' negotiations with Nesco. These plans apparently reflect a forty foot wide store. The Jays never paid for these plans and never received permission to use the plans.

Two other sets of plans, the so-called "Chevron-approved," plans were also used. The Chevron-approved plans are much more detailed than the first set. The first set of plans were used for the interior layout of the facility. The Chevron plans were used for the majority of the project. The evidence does not establish that the building is the wrong size. Nesco did make a mistake, however. Nesco was initially constructing the building according to one set of Chevron-approved plans that was an outdated set of plans. The facility did not have the correct glass for the front facade and did not have the modern pyramid-shaped front entryway. When brought to its attention, Nesco corrected these mistakes. The evidence presented fails to present any clear agreement concerning whether a forty foot or thirty-six foot wide building was contemplated. Given this, the court cannot find that Nesco built the "wrong building."

(3) Failure to Timely Complete

Third, the Jays contend they were damaged by Nesco's failure to timely complete the construction by April 1, 2000, as promised. The parties did contemplate a possible April 1 completion date for the project.

2. In the court's prior memorandum opinion, the court addressed the issue of whether Nesco agreed to pay for the equity in the property. The court found that Nesco had agreed to pay $240,000 in consideration for the deed, but failed to make the payment. The court further found that the $240,000 was included within the principal amount of the loan. Mr. Jay mentioned this issue at the second trial as an example of a default by Nesco, but proffered no further evidence on the issue. The court infers that the change orders, delays in construction, and cost overruns caused the project to exceed the original budget. This would explain Nesco's failure to fund the $240,000 and its request, in August, 2000, that the Jays execute a new lease with the rent increased by approximately $4,600 per month, such lease with increased rental payments constituting a condition to Nesco funding the $240,000. See Pls.' Ex. 13; see also Memorandum Opinion at 49 through 51.

The lease, which is the only written instrument that addresses the time for completion of the project, at paragraph 1.01, states as follows:

The term of this lease is 240 months, beginning on April 1, 2000, and ending on March 31, 2020, unless terminated sooner as provided in this lease. Should the construction of the property not be completed by April 1, 2000, the beginning of the lease term shall be delayed until the construction is complete and transferred to Tenant for occupancy. Should such transfer to Tenant be delayed beyond April 1, 2000, the other terms and conditions, including the end of the lease term, shall be adjusted accordingly.

Pls.' Ex. 6, ¶ 1.01. The parties obviously contemplated the possibility that the completion date would go beyond April 1, 2000. The April 1 date was the earliest possible date, but was not a firm date. The Jays went into possession of the premises and began operations on September 1, 2000. The loan repayment (the so-called lease payments) did not begin until completion of the project.

Related to the Jays' claim that Nesco failed to timely complete the project, is their claim that Nesco failed to complete the project at all. The signage, the valets on the islands, and trash cans were not installed until after September 1, 2000. The Jays assert that as a result of Nesco failing to install such items, the store had the appearance of "not being open for business." At trial, Mr. Jay testified that this false appearance made the convenience store look as if it was still under construction and not otherwise open to the public. Indeed, the pictures introduced into evidence show a somewhat skeleton-looking gas station that was not fully complete. The Jays paid a third party $3,100 to complete the installation of these various items. This installation was not completed until April 1, 2001. The Jays contend that they are entitled to recover not only the $3,100 in out-of-pocket expenses to complete the project, but also an amount for lost revenue from September 1, 2000 to April 1, 2001.

■ Nesco failed to complete the project. Normally the Jays would be entitled to recover the amounts paid to complete the project upon the builder's failure to finish the project. *Weitzul Const., Inc. v. Outdoor Environs.*, 849 S.W.2d 359, 363 (Tex.App.—Dallas 1993, writ denied). However, in this instance, the court is attempting to restore the parties to their respective positions before the transaction. *See Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex.1987).[3] To the extent the consideration as promised was not provided by Nesco, this amount is not relevant to the court's determination in this case. *See Southwest Petroleum Co. v. Cox*, No. 07–98–0393–CV, 1999 WL 994315 (Tex.App.—Amarillo Oct. 29, 1999, no pet.) (discussing that in the context of a pretended sale, there is no restoration required when consideration was not actually provided).

3. As discussed in this court's prior memorandum opinion, the transaction entered into by the Jays and Nesco, although disguised as a sale, was actually intended as to be a loan between the parties. The conveyance of the .85–acre tract to Nesco was simply a vehicle for Nesco to secure a lien on the Jays' homestead property in violation of the Texas Constitution. This court held that the deed from the Jays was void and that title never passed to Nesco. However, in addition to restoring title to the .85 acre tract in the Jays, it is this court's duty to attempt to restore Nesco to its position before the transaction. *See Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex.1987). "Restoration or an offer to restore consideration received by one seeking to cancel a deed is a condition precedent to maintaining a suit for cancellation of an instrument." *Id.*

While the Jays' claim for out-of-pocket expenses incurred in completing the project is not relevant to the restoration of the parties' respective positions, the Jays' claim for consequential damages in the form of lost profits is relevant to this court's final determination.

■ At trial, Mr. Jay testified that his sales were not as high as they would have been because the convenience store did not look "open for business" to the public. *See Ganz v. Lyons P'ship, L.P.*, 961 F.Supp. 981, 991 (N.D.Tex.1997) (recognizing lay person opinion evidence of lost profits as admissible where such opinion is based on personal knowledge and perception of the facts and data on which his opinions are based). Based upon Mr. Jay's testimony and the pictures introduced into evidence, it is certainly possible that the Jays experienced a reduction in sales as a result of the incomplete appearance of the store. Assigning an amount of damages as a result of such loss is problematic, however.

■ "Where lost profits, in an amount shown with reasonable certainty, are the natural and probable consequence of the wrong complained of, then they may be recovered." *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E–Systems, Inc.*, 257 F.3d 461, 467 (5th Cir.2001) (citing *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279–80 (Tex.1994)). This includes proving that the damages suffered were caused by the other party's conduct. *Ganz*, 961 F.Supp. at 989 (citing *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 477–78 (Tex. 1995)); *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex. 1985). "The requirement of reasonable certainty is a flexible one, demanding a sensitivity to the facts of a particular case." *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG*, 257 F.3d at 467 (citing *Texas Instruments, Inc.*, 877 S.W.2d at

279). When evaluating a claim for lost profits based on a new venture, the Texas Supreme Court has said:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Texas Instruments, Inc.*, 877 S.W.2d at 279. However, when there are other reasons to expect a particular business to yield a profit, lost profits will not be denied simply because a business is new, because, "[t]he fact that a business is new is but one consideration in applying the 'reasonable certainty' test." *Id.* at 280. A claim for lost profits may be sustained as long as, at a minimum, the estimate of lost profits is based on objective facts, figures, or data. *See Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). At trial, Mr. Jay testified that he did not know how much revenue was lost because of the incomplete appearance of the structure.

The Jays' evidence supporting the amount of lost profits rests solely on the deposition testimony of Paul Lukert. Paul Lukert is a C.P.A. who has prepared the Jays' tax return for the last twenty-five years. Mr. Lukert and Mr. Jay have personally done business together in the past, including co-owning a building adjacent to the .85–acre tract at issue. Mr. Lukert has no personal experience with convenience store gas stations besides preparing the Jays' tax returns. Mr. Lukert testified regarding two matters: (1) the amount of lost profits of the Jays during the time period in which the store was

open but incomplete, and (2) the reason why the Jays experienced such losses.

Mr. Lukert's analysis and opinion of the amount of lost profits of the Jays from September 1, 2000 to April 1, 2001 is relatively simple and straightforward. The equation is summarized as follows: (Sales when building complete—sales when building incomplete) X net profit percentage = lost profits during September 1, 2000 to April 1, 2001. Mr. Lukert took the difference in sales between the period of September 1, 2001 to April 1, 2002 (period with signage, etc.) and September 1, 2000 to April 1, 2001 (period without signage). He claims this amount reflects the amount of lost sales during the time period. Mr. Lukert then calculated the Jays' "net profit percentage." He states that this percentage reflects the amount of net profits the Jays make off any given amount of sales. Finally, he multiplies the amount of lost sales by this "net profit percentage." The result, he claims, is the amount of lost profits due the Jays during this time period.

Mr. Lukert's ultimate opinion on lost profits of the Jays began by comparing gross sales during the months in question. Mr. Lukert compared actual sales from September 1, 2000 to April 1, 2001, the months the store was incomplete, to the same time period a year later when the store was complete, September 1, 2001 to April 2002. The sales are as follows:

|  | Building Incomplete | Building Complete |
| --- | --- | --- |
| September | $106,409.00 | $147,171.21 |
| October | $ 93,744.00 | $131,336.28 |
| November | $114,389.00 | $138,685.11 |
| December | $115,757.00 | $133,076.36 |
| January | $ 94,675.87 | $107,783.25 |
| February | $ 99,312.28 | $ 94,940.03 |
| March | $122,177.16 | $127,269.00 |

Net difference = $133,796.93.

Sales during the months immediately following completion of the building (April 1, 2001) are as follows:

| April 2001 | $130,083.58 |
| --- | --- |
| May 2001 | $149,691.65 |
| June 2001 | $148,791.67 |
| July 2001 | $148,791.05 |
| August 2001 | $145,738.80 |

In his deposition, Mr. Lukert gave several opinions regarding the possible causes of the reduction in sales from September 1, 2000 to April 1, 2001.

Mr. Lukert testified that many factors besides a lack of signage could lead to a decline in sales. Mr. Lukert stated that factors such as the local economy, oil and gas prices, seasonal traffic, management of the business, and sufficiency of inventory would also affect relative sales. Mr. Lukert testified that he did not research any such possible causes. He also did not testify that the lack of signage was the sole or even predominate factor in the reduced sales. Mr. Lukert testified that he has no prior experience with convenience stores besides preparing the Jays' tax returns for the business. In short, Mr. Lukert's testimony, while admitted, does not help the court understand the cause for the loss in sales. *See BioCore, Inc. v. Khosrowshahi,* 183 F.R.D. 695, 699 (D.Kan.1998) ("The touchstone of Fed.R.Evid. 702, as noted above, is the helpfulness of the expert testimony, *i.e.* whether it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting *United States v. Downing,* 753 F.2d 1224, 1235 (3d Cir.1985)). Any attempt to assess damages for Nesco's failure would be based on mere conjecture. The Jays cannot prevail on their claim for lost profits.

(4) Alleged Defects in Construction

██ Fourth, the Jays complain of various defects in construction. They contend the steel joists used for the construction were of the wrong size, which Nesco cut (or spliced) to conform to the building size.

The Jays apparently contend this compromised the structural integrity of the building. The joists ordered were too long and did in fact have to be cut or "spliced" to fit. They were then welded into place.

To support their claim, the Jays rely on the deposition testimony of Tommy Hixson. Mr. Hixson is a structural engineer retained by the Jays to evaluate the structural integrity of the convenience store, specifically the steel joists. Mr. Hixson spent approximately two hours reviewing the construction plans for the store, as well as the store itself. He also evaluated several other documents including depositions, interrogatories, soil reports, geologist investigations, and reports from the joist manufacturer. Mr. Hixson did not perform any actual tests or run any calculations to determine the adequacy of the joists. After this evaluation, Mr. Hixson stated that he was "concerned" with the situation and that more extensive follow-up work should be done to determine the adequacy of the joists. Mr. Hixson never did any such follow-up tests. Mr. Hixson admitted that if done properly, the joists could have been welded in a manner that would adequately support the roof. Though Mr. Hixson did not run any more detailed tests or calculations, his ultimate opinion was that, based on his viewing of the joists, he did not think that the joists installed in the building could properly support the roof load. Mr. Hixson proposed a course of action to add additional support at a cost of between $40,000 to $50,000.

Nesco offered the testimony of James Burkhardt, another structural engineer. Mr. Burkhardt examined the store twice, including the steel joists. Mr. Burkhardt ran calculations on his measurements of the joists and determined that the beams were twice a strong as needed to support the roof. Explaining his conclusion, Mr.

Burkhardt noted that a shorter joist can carry more load than a longer joist, and that as long as the weld was sufficient, the joist would easily support the load of the roof. Mr. Burkhardt concluded there was nothing wrong with the store from a structural standpoint.

Mr. Hixson stated that his evaluation of the joists raised "concerns" that would require additional tests to determine the adequacy of the joists. No such tests were ever performed by Mr. Hixson or any other witness for the Jays. On the other hand, Mr. Burkhardt performed extensive evaluations, tests, and calculations to come to his unequivocal opinion that the existing joists are sufficient, and that nothing is wrong with the store from a structural standpoint. In evaluating the testimony of the two experts, the court finds that the Jays failed to prove that the cutting and welding of the steel joists adversely affected the structural integrity of the building.

With respect to the Jays' claim that water was leaking into the fuel tanks, the court notes that the Jays failed to present any evidence indicating the cause for the leakage or damages arising as a result of the leakage. While this may indeed be a serious matter, the court cannot conclude from the evidence presented that any problems associated with water leaking into the fuel tanks was caused by Nesco.

Finally, the Jays complain that the facility was built over a water main thereby jeopardizing the facility. One corner of the facility does cross over an easement, where the water main is located. The water main is buried fifteen feet under the surface. There is no evidence that the location of the facility relative to the water main constitutes an intentional or negligent act on Nesco's part. The only evidence before the court is that Nesco used a survey obtained by the Jays and which

had no description of easements. There was also evidence of a possible crack or "wrinkle" on the building exterior and of cracks in the floor tile. Again, however, there is no evidence these were caused by Nesco. The court finds there is no viable claim by the Jays for defective construction.

### Liquidation of Claims

Having held that the transaction between the Jays and Nesco is a sham transaction, and that Linc's innocent lienholder claim must fail, the court must now determine the amount of the claim held by Nesco in this bankruptcy proceeding. In its memorandum opinion, the court stated that Nesco's claim would be measured by the amount of funds actually advanced by Nesco, with an appropriate interest rate.

The lease states that the principal amount of the loan was $1,281,000.[4] This sum includes the $150,000 advance promised by Nesco. The court has found that Nesco's obligation for the $150,000 was satisfied by the $50,000 advance made and credits taken by the Jays for "lease" payments. The court also notes that the $240,000 payment promised by Nesco for the Jay's equity in the property was effectively satisfied by the increased construction costs on the project. In short, the court is satisfied that Nesco actually advanced the principal sum of $1,281,000, less the credited lease payments. As an additional credit against this sum is the value of 1.04–acre tract, which the court has found to be $176,000. There is no evidence concerning interest accrual on the loan to the time of the bankruptcy petition. Nesco will be directed to file a proof of claim within twenty days of entry of an order conforming the court's ruling herein.

### The 1.04–Acre Tract

By the court's prior memorandum opinion, the court, consistent with its conclusion that the transaction constitute a pretended sale with the deed constituting a mortgage and further finding that the Jays had conceded that they have no homestead claim to the 1.04–acre tract, construed Nesco as holding a mortgage against the 1.04–acre tract. In making these findings, the court had overlooked its prior order entered July 31, 2003, on Nesco's motion for judgment. As set forth in such order, the Jays had conceded that the evidence presented by the Jays did not support judgment in favor of the Jays concerning the 1.04–acre tract and that Nesco, Inc. was declared to be the fee simple owner of the 1.04–acre tract. The court's prior memorandum opinion is hereby so modified.

### Conclusion

From the foregoing, the court denies Linc's innocent lienholder claim, the Jays' claims for damages, and finds that Nesco shall have an unsecured claim that is equal to the principal loan amount of $1,281,000, less the credited lease payments and the value of the 1.04–acre tract ($176,000), plus interest to the time of the Jays' bankruptcy filing. Nesco is instructed to file its proof of claim (or amended claim) within twenty days of entry of the court's order on this memorandum opinion. It is unnecessary to address other claims made by the parties. All other relief is denied.

### STATEMENT OF FACTS FROM PRIOR MEMORANDUM OPINION

The Jays acquired title to the .85–acre tract, which abuts Interstate 20 in the City

---

4. In the memorandum opinion, the court referred to the note amount as referenced in the schedule attached to the lease as being $1,267,898.76. This is a mistake. This represents the principal amount after the first payment was made. The correct principal amount is $1,281,000.

of Ranger, Texas, sometime in 1984. At that time, and through to the present, the Jays have used such tract to operate a service station and convenience store. The Jays also acquired an adjoining 1.04–acre tract, which they sometimes leased to others, or operated as a liquor store. The 1.04–acre tract was not being used by the Jays in 1999. The Jays have never resided or maintained a home on either the .85–acre tract or the 1.04–acre tract, nor have they ever intended to maintain a home on either tract. Beginning in 1997, the Jays decided to upgrade their facilities on the .85–acre tract to allow them to better compete with their competition. In November, 1999, the Jays entered into negotiations with Nesco[1] to finance the improvements on the .85–acre tract. Nesco told the Jays that conveyance of both tracts was necessary to the transaction. Mr. Jay testified that Nesco agreed to build the new facility and would "somehow" lease it back to the Jays. The first written instrument between the Jays and Nesco is the Retail Store Lease ("lease") signed on December 15, 1999. Nesco Acceptance is the landlord and the Jays are the tenants under the lease. The lease generally provides that its term would begin April 1, 2000, and run twenty years, with the Jays holding an option to extend such term for some period thereafter. The lease also provides the Jays with an option to repurchase both tracts at any time during the lease or upon its termination. Appended to the lease is a schedule for payments to be made by the Jays for the "[t]erm of [l]oan." The schedule reflects a "[l]oan [a]mount" of $1,281,001 with an "[a]nnual [i]nterest [r]ate" of 11%, compounded monthly. To exercise their option to repurchase the tracts, the Jays pay a flat fee (which decreases over time),

plus the unpaid principal balance owing under the schedule at the time they exercised the option.

The Jays closed down operations on the .85–acre tract in late December, 1999, in preparation for demolition of the existing facilities, which began on January 1 or 2, 2000, and was completed January 7, 2000. On January 13, 2000, the Jays conveyed, by warranty deed, title to the .85–acre tract to Nesco Inc. On the same date, the Jays conveyed their interest, if any, to the 1.04–acre tract to Saul Pullman by quitclaim deed. Contemporaneously with such deed, Saul Pullman executed a warranty deed covering the 1.04–acre tract to Nesco Inc. This was structured to avoid any questions concerning title to the 1.04–acre tract given the Jays' contention that Saul Pullman, apparent owner of such tract, had acquired the 1.04–acre tract through a wrongful foreclosure. As part of the transaction, Nesco paid Saul Pullman in full for the debt apparently owing to him by the Jays. Nesco also paid other judgment liens that had been recorded against both tracts.

Construction of the new facilities on the .85–acre tract began sometime shortly thereafter. Construction was not completed within the time frame contemplated. This was due, apparently in large part, to several change orders submitted by the Jays. These change orders had the additional affect of substantially increasing the cost to Nesco of erecting the new facilities. Mr. Jay testified that he understood he was to receive $240,000 cash from Nesco upon conveyance of the two tracts. The value of the .85–acre tract and the 1.04–acre tract was, according to an appraisal done December 13, 1999, $130,000 and $176,000, respectively. Nesco, according to Jay, would satisfy liens against the

---

1. Where the evidence is unclear concerning whether the party referred to is Nesco Acceptance or Nesco Inc., the court will simply refer to "Nesco."

tracts of approximately $60,000. The remaining equity of approximately $240,000 would then be paid by Nesco. In addition, Nesco agreed to provide $150,000 for inventory and capital. In July, 2000, Nesco did pay $50,000 to the Jays. Nesco did not pay the Jays the $240,000 equity that Mr. Jay testified they were owed. Instead, in August, 2000, Nesco Acceptance attempted to secure a new lease agreement with the Jays, and conditioned "paying" the $240,000 on the Jays agreeing to such new lease. The new lease called for an increase of monthly payments from $13,102.24 to $17,754.

Construction of the new facilities was eventually completed, and the Jays reopened the service station and convenience store. The Jays failed to make timely lease payments to Nesco as required by the December 15, 1999, lease.

On June 27, 2001, Nesco Inc. granted a lien to Bank One by executing a deed of trust covering the .85–acre tract. The lien was granted to secure financing provided to Nesco Inc. by Bank One. Sometime thereafter, Bank One sold its interests in the Nesco note and the deed of trust to Linc. The Jays filed a lis pendens concerning both tracts on September 23, 2002.

In June, 2001, Nesco obtained judgment in the Justice of the Peace Court Number 2, in Eastland County, granting Nesco a writ of forcible detainer and possession of the properties. The Jays subsequently appealed this judgment to the District Court for Eastland County. The Jays filed a voluntary petition under Chapter 13 of the Bankruptcy Code on October 24, 2001. Upon filing their Chapter 13 petition, the Jays removed the state court action to federal district court, where, at that time, the Jays already had a separate action pending against Nesco. The federal district court consolidated the two actions and, by order dated March 8, 2002, re-

ferred such consolidated case, which forms the present adversary, to this court.

Nesco Inc. filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Northern District of Oklahoma, on November 26, 2001. The Jays filed a proof of claim as unsecured creditors in Nesco's Chapter 11 case. The Jays received notice of Nesco's disclosure statement, Chapter 11 plan, and of the order and notice for hearing on the disclosure statement and plan. The Jays did not file an objection to confirmation of Nesco's plan, which the Oklahoma bankruptcy court confirmed on June 6, 2003.