PATRICK E. HIGGINBOTHAM, Circuit Judge,
dissenting:
I
I am not persuaded by the majority opinion. With respect, I dissent.
The bankruptcy court, affirmed by the district court, found that the effective date of the deed related back to December 15, 1999, by which time there was a contract for sale. The majority holds that the January 13, 2000 delivery of the deed did not relate back to December 15, persuaded that there was no such contract to sell the property.
The courts below held that a contract for sale existed by December 15, the date the parties signed the Lease. Nesco demolished the existing building and began construction on January 2 or 3 and received the deed on January 13. They concluded, and I agree, that it makes little sense for Nesco to demolish a building on property it had no right to purchase, or for the Jays to deliver a deed to land for which there was no contract for sale, oral or otherwise. And Nesco could not lease property to the Jays that it did not own.
There is more than the strangeness of the events as portrayed by the majority. By the Lease terms, Nesco was the owner and lessor and the Jays were the lessees; that is, there was to be a purchase of the land by Nesco and its lease back to the Jays. No surprise here, since the claim in this case is that the transaction was a “pretended sale” in which the parties structured what was a lien as a sale and *328 leaseback, with the “lease” which set the “rent” and the terms on which the Jays could “buy” back their property embodying the pretended sale. It was not a normal lease. More to the point, to say simply that “[a] lease does not constitute a contract for sale” begs the question of whether this was a lease or a loan — that is the issue in the case.
It is difficult to quarrel with the conclusion of the bankruptcy court that “no doubt” an oral or implied contract for sale was formed.[1] If so, the lower courts did not “expand the relation-back doctrine” to reach a lease. They rather found that there was an agreement for sale. We should affirm the bankruptcy court’s well-supported conclusion that the Jays satisfied the widely accepted, if exacting, requirements for showing the existence of an oral or implied contract, giving it discretion to apply the equitable relation back doctrine.[2]
And I would affirm its application of that discretion. Finding there to be “little doubt that Nesco structured its transaction to circumvent Texas homestead laws,” the court applied the doctrine for two reasons: 1) to give effect to the parties’ intentions, because the parties believed that the .85 acre tract constituted the Jays’ business homestead, and 2) to preserve rights that would otherwise be lost, because the Jays lost rights by January 13, 2000, a loss not contemplated in the December 1999 Lease. The exercise of discretion in light of either rationale was proper.
II
Having agreed with the lower courts that the operative date for the transaction was December 15, 1999, I must reach the question of which definition of “homestead” controlled on that date. We review the lowers courts’ ruling on this legal question de novo.[3]
The Texas constitution protects homesteads from “forced sales ... for the payment of debts.”[4] Prior to 1999, the constitution defined “homestead” to include a *329 home or place of business; the latter is called a “business homestead.”[5] In November 1999, an amendment to the constitution redefined a business homestead as property that is both a home and place of business.[6] The Texas legislature enacted a statutory provision reflecting this change on January 1, 2000,[7] leaving alone the nearby statutory section stating that the statutory definition applied to all homesteads “whenever created.”[8] Here, both parties agree on appeal that if the new definition applies, the Jays cannot recover because they never lived on either of the two tracts. The Jays, of course, argued that the old definition should apply, and the lower courts agreed.
The lower courts found that the amendment was “self-effectuating” when passed in November 1999, meaning that no legislative or other action was needed to change the definition of “homestead.” They also found that the constitution’s new definition of “homestead” prevailed over the old, contrary statutory definition, which was not updated to reflect the constitutional change until January 1, 2000. “The result is that, as of December 15, 1999, the change in Texas law was complete — an urban homestead could not be [created] without the maintenance of a home thereon.”[9]
However, the courts also found that the amendment applied prospectively by default, meaning that property which previously had attained the status of homestead retained that status absent a constitutional or statutory provision stating that the constitutional amendment applied retroactively. Because there was no such constitutional or statutory provision providing for retroactivity of the new definition on December 15, 1999,[10] the Jays’ property was protected on that date.
It was not until January 1, 2000, when the statutory provision updating the definition was enacted, that the amendment became retroactive and the Jays’ .85 acre tract lost its status as a homestead. The courts then held that the tract lost its status as a homestead only with respect to transactions entered into after January 1, 2000, because any retroactive application for transactions occurring before January 1, 2000 would alter the substantive rights and obligations of the parties in violation of the Texas constitution’s prohibition against ex post facto or retroactive laws.
In short, the lower courts held that the amendment was silent regarding retroac-tivity when passed and became retroactive by virtue of the January 1, 2000 statute, retroactive only for transactions entered into after January 1, 2000. In other words, the “retroactivity” enacted by the statute removed the homestead shield from property like the Jays’ in Texas, property which had gained that shield in the past, but not for past transactions.
*330 I agree with the bankruptcy court that amendments to the homestead provision of the Texas constitution are not retroactive when silent about the retroactive reach. The Texas Supreme Court has so held.[11] Other federal and state courts, in holding that the amendment itself[12] or a statute[13] can overcome the default and provide ret-roactivity, concur. As the bankruptcy court held, “some positive action, either by constitutional or legislative provision, is required to divest property of its homestead character ____” Consequently, we also agree with the bankruptcy court’s conclusion that the January 1, 2000 statute validly made the amendment retroactive.
I also agree with the bankruptcy court that, as a result of the statute, the .85 acre tract “lost its character as a business homestead” only “with respect to transactions entered into after” January 1, 2000. It held that this was so because “[t]he laws existing at the time a contract is made become a part of the contract and govern the transaction,”[14] and because the new definition could not be applied to old transactions without violating the Texas Constitution’s prohibition against retroactive laws.[15]
While agreeing with the bankruptcy court’s conclusion, I do not decide whether providing statutory retroactivity[16] for transactions occurring before the change in definition would violate the prohibition on retroactive laws. Rather, I construe the statute to avoid that constitutional question. The statutory language — “[t]he definition of a homestead as provided in this section applies to all homesteads in this state whenever created” — does not answer the question of whether the new definition applies to transactions occurring before the statute was enacted, as distinguished from the redefinition of all homesteads whenever created from that date foreword. I have found no case where the *331 court applied that or similar retroactivity provisions to such transactions; all of the retroactivity cases involve application of the new wording to land that was designated a homestead before the change, either maintaining or removing its homestead status for future transactions. Moreover, in one of those cases the court, after holding that the 1970 amendment “applies to all homesteads in this state, including homesteads acquired before the adoption of this amendment,”[17] held that “its framers and adopters [intended it to be] retroactive with respect to judgment liens attaching after its effective date.”[18]
And this, to my eyes, was the likely intent of the legislature, to redefine which properties received homestead protection in the future, potentially stripping old homesteads of their protection. I cannot assume that it intended to upset concluded transactions framed against settled laws.[19] And we need not decide whether the contrary construction would violate the Texas constitution to be cognizant of the specter of constitutional infirmity in reading this ambiguous statute.[20] The construction urged by appellants would mean that contracts for liens on homesteads violative of the homestead provision when made, and thus void, could be revived years later by statutory change. At a minimum this would engage the Texas constitution’s prohibition on retroactive laws, a path to be avoided in statutory construction.[21]
For these reasons, I would hold that the old definition of “business homestead” applied to the December 15, 1999 transaction. The parties agree that the .85 acre tract satisfies that definition.
Ill
Because the .85 acre tract was a homestead, “[a]ll pretended sales of the homestead involving any condition of defeasance [are] void.”[22] The “question of whether an instrument written as a deed is actually a deed or is in fact a mortgage” is a question of fact,[23] reviewed for clear error.[24] I would affirm the lower courts’ conclusion that the deed was a disguised mortgage.
Under the Texas constitution, an option to repurchase, such as the one held by the Jays, is a sufficient “condition of defea-sance” to void a pretended sale.[25] Wheth *332 er a sale was “pretended” is determined primarily by the intent of the parties.[26] The lower courts made several observations in concluding that the parties intended to disguise a mortgage. First, Mr. Jay originally sought a loan, and later he rejected two offers for “sale” which did not include options to repurchase. Moreover, Nesco was not in the business of owning and leasing real estate, but rather was a finance company with its own constructions crews.
More importantly, the courts noted that the Jays conveyed both the .85 and 1.04 acre tracts,[27] worth a total of $306,000, of which approximately $240,000 was equity after Nesco paid off $60,000 in alleged liens. Nesco never paid the Jays this $240,000. The evidence revealed that Nes-co considered this money part of the funds it was advancing to the Jays and which the Jays would have to pay back in the “lease” payments. Thus, the equity could never have been paid because whatever money the Jays might have received they would have had to pay back.
The courts further noted that, while Nesco never explained to them its failure to pay the $240,000, the failure was made plain by its August 14, 2000 letter to the Jays, demanding increased lease payments before it would pay the Jays the $240,000. The original amortization schedule attached to the lease listed the principal balance owing as $1,267,898.76. Unforeseen increased construction costs may have eaten up all of this money, leaving nothing with which to pay the $240,000. As a result, Nesco may have demanded increased lease payments to cover the additional construction costs. Whatever the case, I agree with the lower courts that if Nesco agreed to pay $240,000 in purchase money for the properties, it should have paid that amount. That it did not, and that it conditioned paying such amount on an increase in monthly rent payments, is compelling evidence that the $240,000 was not purchase money but part of a loan secured by the properties. Much about the original intent of contracting parties is found in their subsequent performance of the contract.
The bankruptcy court also observed that part of the $1,267,898.76 balancing owing listed on the Lease represented $150,000 in working capital provided to the Jays, although only $50,000 of that was paid. No one can explain why this money was anything but a loan, unconnected in any way to the value of the property, for which the property was security.
In sum, that the whole transaction was a loan is clear: “loan” appeared everywhere on the Lease, with the Lease payments based not on rental value but on an amortization of the “loan amount” with payments reducing the “balance” due. In addition, the Jays would have had to pay a set fee to exercise the option to “repurchase” the property. The fee had no relation to the property’s market value, decreasing after time to $64,050 plus the balance owing for the so-called lease payment. Thus, after paying off the loan, the Jays could have “repurchased” their property for the fire-sale price of $64,050.
This is overwhelming evidence that this was a mortgage transparently cast as a sale. The lower courts were not clearly erroneous in so concluding.
*333 Nesco, quoting a case from this court, argues that
[t]he mere fact that the [land] may have been transferred ... solely in order to avoid the prohibition against encumbering the homestead does not alone convert a legitimate sale into a “pretended sale” or sham transaction. Rather, a sale is “pretended” if the parties to the sale did not intend for title to vest in the purchaser.[28]
It emphasizes that the only person to testify at trial to the intent to vest title was Mr. Jay, who stated that “[t]hey were to build me a convenience store of my specifications, they were to furnish me with inventory and working capital, pay me for the equity of my land, and I had an option to repurchase.” The lower courts were not clearly erroneous in concluding that this testimony, when viewed in light of the evidence described above, especially Mr. Jay’s testimony that he rejected other financing offers because they did not include an option to repurchase, was insufficient to find that Mr. Jay had the intent to vest title in Nesco.
I also agree with the lower courts’ rejection of Nesco’s argument that, because it could have placed a lien on the .85 acre tract for purposes of improving it,[29] its lack of motive to circumvent the homestead provision proves it had no intent to do so. Nesco conceded that it could not have placed a lien over the $150,000 in working capital. Its arguments that that aspect of the transaction was “plainly secondary” and that it would not have risked a potential $1 million proper lien for improvements to get an additional $150,000 improper lien for inventory are not compelling.
I would hold that the lower courts did not clearly err in deeming the “lease” a disguised mortgage and in invalidating that mortgage.
IV
Having found the underlying transaction to be a “pretended sale” prohibited by the Texas constitution, I must also reach the question of whether the lien held by Line, transferred from Nesco to Bank One to Line, was valid because Bank One was an innocent lienholder for value without notice.[30] Because the ruling here turns on a question of law, review is de novo,[31] and I would reverse the lower courts, which found that Line’s lien was void because Bank One had constructive notice of the underlying transaction.
When a transfer of property is found to have been a pretended sale prohibited by the Texas constitution, the deed is void and the pretended buyer holds an unsecured debt for the amount loaned to the pretended seller.[32] However, a subsequent purchaser or lienholder can prevail against a homestead claimant if the subsequent purchaser or lienholder was an innocent purchaser for value without notice of the facts giving rise to the homestead claim.[33] To be classified as an innocent *334 purchaser or lienholder, the party must have acted in good faith.
It is undisputed that Bank One paid value for the lien, acted in good faith, and had no actual knowledge of any potential claim by the Jays. The lower courts found that it had constructive notice of a potential homestead claim by the Jays. Interpreting In re Rubarts,[34] which ostensibly reconciled Eylar v. Eylar[35] with Moore v. Chamberlain,[36] the lower courts concluded that “a homestead claimant’s possession of property imposes upon the third-party purchaser or lender a duty of inquiry that is not automatically discharged by merely checking the record title.” Because the Jays were in possession of the tracts and Bank One made no investigation beyond a record check, the lower courts held that it should be charged with constructive knowledge. Because the question of whether a record check is insufficient to discharge a lender’s duty of inquiry where the homestead claimant is in possession is a pure question of law, we review de novo,[37]
While the lower courts’ interpretation of Rubarts was not unreasonable, I think it equally plausible to read that case to the contrary, as requiring no more than a record check where the homestead claimant is in possession and where there is no other reason to suspect a homestead claim. Any further inquiry by Bank One past the record check here probably would have been futile. In December 2000, the Jays verified the lease in response to a letter from Nesco’s auditors seeking verification. If Bank One had asked the Jays about the lease, nothing suggests that the Jays would have offered a different response. Asking an innocent lender like Bank One to shoulder the burden of figuring out whether the Jays had a homestead claim— a task which it would have taken this court more than fifteen pages to perform — is commercially unreasonable and I do not read Texas law to do so.

. The bankruptcy court also included a useful footnote attempting to explain the delay between the signing of the Lease on December 15, 1999 and the delivery of the deed on January 13, 2000. It noted that a third-party had allegedly foreclosed on the 1.04 acre tract and that both parties had contacted this third-party, who eventually executed his own deed after Nesco paid him off. I agree with the court that, "as is more than likely, the delay in execution of the deed was logistical. Documents had to be prepared, and [the third-party] and others had to be contacted and persuaded to release their liens.”

. The majority rejects this conclusion because the terms of the contract were allegedly insufficiently definite, thereby creating the danger that all negotiations could be judicially recast as contracts. In fact, the terms here were exact, as they are embodied in the Lease itself. The Jays contracted to sell definite land (the two tracts) for a definite price (the amortization schedule) under definite conditions (the other terms in the Lease). The contract was clear as to all essential terms. The majority ignores the real issue here: whether the Lease was a lease or a contract embodying a pretended sale. Put another way, it is of course necessary for an oral or implied contract to have definite terms. But there is no dispute here over what the terms were — we can tell what they were by the parties' own course of performance. The dispute is only over when the terms were agreed to. And it is clear that they were agreed to by December 15, when the parties put onto paper their intent that the Jays would "sell” the land to Nesco, who would then "lease” is back to them. Whatever agreement existed, existed by that date. Everything after that date was performance of the contract, performance perfectly in line with the precise terms of the contract.

. Morante v. Am. Gen. Fin. Ctr., 157 F.3d 1006, 1009 (5th Cir. 1998).

. Tex. Const, art. XVI, § 50(a), (c) (2005).

. Tex. Const, art. XVI, § 51 (1999).

. Tex. Const, art. XVI, § 51(c) (2005).

. The act making the change was passed on May 28, 1999, but it provided that it was to "take effect January 1, 2000, but only if the constitutional amendment ... is approved by the voters.”

. Tex. Prop.Code Ann. § 41.002(a),(d) (Vernon 2002).

. The Jays do not challenge this conclusion on appeal.

. As noted above, both on December 15, 1999 and January 1, 2000, Tex Prop.Code Ann. § 41.002(d) had the same language applying the statutory definition in § 41.002(a) to homesteads "whenever created.” That is, the January 1, 2000 statutory amendment did not alter the retroactivity section of the statute. But on December 15, 1999, the statutory definition was the old definition.

. See Linch v. Broad, 70 Tex. 92, 93-95, 6 S.W. 751 (1888) ("The provision of the present constitution enlarging the homestead exemption cannot be given retroactive application ... so as to embrace in 1877 all property which in 1859 did not exceed in value the enlarge exemption prescribed by the constitution of 1876, without regard to value in 1877."); Wright v. Straub, 64 Tex. 64, 66 (1885); McLane v. Paschal, 62 Tex. 102, 106-07 (1884).

. See Dallas Power & Light Co. v. Loomis, 672 S.W.2d 309, 310 (Tex.App. — Dallas, writ ref d n.r.e.).

. See In re Niland, 825 F.2d 801, 807 n. 2 (5th Cir.1987) (suggesting that earlier amendments were not retroactive until Tex. Prop. Code § 41.002(c), passed in 1984, applied changes in the definition of homestead to homesteads "whenever created”); In re Stams, 52 B.R. 405, 413 (S.D.Tex.1985) (holding that amendment receives retroactive application because Tex. Prop.Code § 41.001(c) provides retroactivity); In re Barnhart, 47 B.R. 277, 282 (Bankr.N.D.Tex.1985) (recognizing distinction between cases before 1983 amendment to constitution and 1984 codification of Tex. Prop.Code § 41.001(c), where there was no retroactivity, and cases after the amendment and codification of there, which specifically provided retroactivity).

. Wessely Energy Corp. v. Jennings, 736 S.W.2d 624, 626 (Tex. 1987).

. See, e.g., Hartman v. Urban, 946 S.W.2d 546, 551 (Tex.App. — Corpus Christi 1997, no writ) ("The substantive rights and duties of a party pursuant to an agreement are those under the law as it existed at the time the agreement was made. A subsequent law that changes those rights and duties would violate the Texas Constitution’s prohibition against ex post facto laws.”).

. The defendants argue that a constitutional grant of retroactivity for the definition, as opposed to a statutory grant, is valid even if it "conflicts” with the constitutional prohibition on retroactive laws. Although this may be true, cf. Dallas Power & Light Co., 672 S.W.2d at 311, we do not decide the issue because the grant of retroactivity here was statutory.

. Id. at 310 (quoting the Texas House Joint Resolution accompanying the proposed amendment).

. Id. (emphasis added).

. Cf. Wright, 64 Tex. at 66 ("Obviously it was not the intention of the convention, in extending the homestead exemption, to divest or interfere with previously existing rights. But if it had been the intention of the convention [to do so], still it has been held by the supreme court of the United States that an existing judgment lien is such a vested right as is beyond the power [possibly because of the contracts clause of the federal constitution] of a constitutional convention to divest or destroy.”) In Wright, a creditor received a judgment lien on a house which later fell under the new definition of a homestead. The court held that it was not the intent of the amendment to destroy a previously existing right — the lien on the house. Here the Jays had a similar previously existing right — homestead protection making an alleged lien invalid. What is good for the creditor seems good for the debtor.

. United States v. Marek, 238 F.3d 310, 322 (5th Cir.2001).

. As discussed by the court in Wright, see supra note 18, it may also violate the federal constitution.

. Tex. Const, art. XVI, § 50(a), (c) (2005).

. Johnson v. Cherry, 726 S.W.2d 4, 6 (Tex. 1987).

. Fed. R. Bank. P. 8013.

. Mosher Steel & Mach. Co. v. Nash, 6 S.W.2d 158, 162 (Tex.Civ.App. — Dallas 1928, writ dism’d w.o.j.).

. Johnson, 726 S.W.2d at 6.

. The court also found it odd that Nesco would buy the 1.04 acre tract but build only on the .85 acre tract and that the Jays would lease back the 1.04 acre tract and do nothing with it, as they had for years. Both acts make sense, of course, if the 1.04 acre tract was never sold but was merely additional security for a loan.

. In re Perry, 345 F.3d 303, 312 (5th Cir. 2003).

. Tex. Const, art. XVI, § 50(a)(5) (2005).

. Nesco gave to Bank One a lien on the .85 acre tract as additional security for a previously issued note. Bank One later sold that note to Line. Because Line "stands in the shoes of his assignor,” Houk v. Commissioner, 173 F.2d 821, 825 (5th Cir.1949), the issue is whether Bank One — not Lino — was an innocent purchaser for value without notice.

. Witty v. Delta Air Lines, Inc., 366 F.3d 380, 382 (5th Cir.2004).

. Johnson, 726 S.W.2d at 7-8.

. Eylar v. Eylar, 60 Tex. 315, 316 (1883); Red River Nat'l Bank v. Latimer, 110 S.W.2d *334 232, 237 (Tex.Civ.App. — Texarkana 1937, no writ).

. 896 F.2d 107 (5th Cir.1990).

. 60 Tex. 315 (1883).

. 109 Tex. 64, 195 S.W. 1135 (1917).

. In re Mercer, 246 F.3d 391, 402 (5th Cir. 2001).